UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | Chapter 11 |
| | : | |
| In re: | : | Case Nos. 05-44481 (RDD) |
| | : | (Jointly Administered) |
| DELPHI CORPORATION | : | |
| INC., et al. | : | |
| | : | |
| Debtors. | : | |
| | : | |
| | : | Chapter 11 |
| AUTOMODULAR CORPORATION, et al., | : | |
| | : | Case No. 08-3752 |
| Appellants, | : | |
| | : | |
| v. | : | |
| | : | |
| DELPHI CORPORATION | : | |
| INC., et al., | : | |
| Appellees. | : | |
| | : | |

---

### BRIEF OF APPELLANT AUTOMODULAR CORPORATION F/K/A AUTOMODULAR ASSEMBLIES INC., TEC-MAR DISTRIBUTION SERVICES, INC AND AUTOMODULAR ASSEMBLIES (OHIO) INC. IN SUPPORT OF APPEAL TO REVERSE ORDER ENTERED BY BANKRUPTCY COURT

---

McCarter & English, LLP

Eduardo J. Glas, Esquire (# EG7027)
245 Park Avenue
27th Floor
New York, New York  10167
(212) 609-6800 - Telephone
(212) 609-6921 - Facsimile
             -- and --
Katharine L. Mayer, Esquire
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19899
(302) 984-6300

Attorneys for Automodular Corporation f/k/a
Automodular Assemblies Inc., Tec-Mar Distribution
Services, Inc., and Automodular Assemblies (Ohio) Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS .....................................................................................................2

    I.      Introduction...............................................................................................2

    II.     The Formation of the U.S. Contract for Lordstown.................................3

    III.    The Formation of the Ontario Contract for Oshawa ...............................5

    IV.    Changes in Scope Generally ....................................................................6

    V.     The Changes In Scope ..............................................................................7

         A.  The Lordstown Changes in Scope ...................................................7

         B.  The Oshawa Changes in Scope .......................................................7

STATEMENT OF ISSUES ON APPEAL ..............................................................................9

STANDARD OF APPELLATE REVIEW..............................................................................9

LEGAL ARGUMENT............................................................................................................10

POINT I-THE BANKRUPTCY COURT  MISINTERPRETED THE CONTRACTS ...............10

         1.     The Bankruptcy Court Erred in Reading Section 3 as Covering Only
              Changes in the Nature of the Product Being Assembled...........................10

         2.     The Bankruptcy Court misinterpreted section 2.5 and 2.7 of
              the Contracts. .........................................................................................11

         3.     The Bankruptcy Court Misinterpreted Section 3 of
              the Ontario Contract................................................................................14

         4.     The Bankruptcy Court Misinterpreted the Nature of
              Automodular's Claim................................................................................15

POINT II-THE BANKRUPTCY COURT ERRONEOUSLY  HELD THAT
THE CONTRACTS WERE UNAMBIGUOUS........................................................................17

POINT III-THE BANKRUPTCY COURT ERRED BY  FAILING TO CONSIDER
EXTRINSIC EVIDENCE..........................................................................................................19

CONCLUSION..........................................................................................................................22

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Tel-Towne Prop. Group v. Toys "R" Us-Delaware, Inc.*, 2007 WL 2572031 (E.D. Mich. Sept. 5, 2007) ..................................................................................................................19

*Vicars v. Environ. Potentials, Inc.*, 2007 WL 2952453 (E.D. Mich. Oct. 9, 2007)......................17

*Wiseco, Inc. v. Johnson Controls, Inc.,* 155 Fed. Appx. 815, 816 (6th Cir. 2005)........................14

*In re Yohannes*, 2007 WL 2034301 (S.D. N.Y. July 17, 2007)........................................................9

### **STATE CASES**

*Century Sur. Co. v. Charron*, 583 N.W.2d 486 (1998)...................................................................11

*Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539 (Mich. App. 2007) ..............................................17

*Cotrill v. Mich. Hosp. Serv.*, 102 N.W.2d 179 (1960) ..................................................................10

*Hesse v. Superior Bus. Forms, Inc.*, 2008 WL 441603 (Mich. App. Feb. 19, 2008) ...................19

*Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447 (Mich. 2003) .............................9, 13

*Scholz v. Montgomery Ward & Co., Inc.*, 468 N.W.2d 845 (Mich. 1991) ...................................19

*Skarina v. AllState Ins. Co.*, 2005 WL 900552 (Mich. App. April 19, 2005) .............................13

*T&S District, L.L.C. v. Mich. Bell Tel. Co.*, 2008 WL 724084 (Mich. App. Mar. 18, 2008) ...............................................................................................................................17, 20

ME1 7333524v.1

## PRELIMINARY STATEMENT

Automodular appeals the decision of the Bankruptcy Court regarding the obligations of Delphi Corp. Inc. and its subsidiaries (collectively the "Debtors" or "Delphi") under two contracts between the parties pursuant to which Automodular sub-assembled auto-parts ultimately supplied to General Motors (GM) for its plants in Lordstown (Ohio) and in Oshawa (Canada). The language of the two contracts provided that changes in the scope of services required the parties to negotiate in good faith a price adjustment. It is undisputed that Automodular was directed by GM to change the manner in which it sub-assembled the parts under the contracts by altering the number of shifts and assembly line speed. GM advised Automodular of these changes via a form entitled "Change in Scope." Based on the undisputed changes and the scope change provisions in the contracts, Automodular sought an administrative expense allowance for a new adjusted price for the services it provided under the two contracts.

The Bankruptcy Court committed numerous legal errors in its interpretation of the contracts, specially in its finding that the scope change provision was limited to changes in the nature of the goods assembled. No such limited language appears in the documents. Moreover, by adopting such interpretation, the Bankruptcy Court rendered superfluous the broad language in the provision dealing with changes in the scope "of any services or work under this Contract." Finally, the Bankruptcy Court erred in finding the contracts unambiguous because the phrase "scope change" is not defined anywhere in the document and is susceptible of more than one reasonable interpretation. Accordingly, the Order entered by the Bankruptcy Court denying Automodular's administrative claim allowance based on a new pricing due to scope changes for its services under the contracts should be reversed.

1

## STATEMENT OF FACTS

### I.   <u>Introduction</u>

Automodular is engaged in the sub-assembly and sequencing of automotive modules delivered to original equipment manufacturers or "OEM" on a just-in-time basis.   <u>See</u> Declaration of Michael Blair dated Feb. 15, 2008, and all exhibits thereto (hereinafter "Blair Dec"), ¶¶ 6-7; Appellants' Record on Appeal (hereinafter "App. Rec. No."), Document No. 6.

Automodular receives directions only from the OEM's final assembly plants, regardless of whether Automodular is under contract to the OEM or to a Tier 1 supplier to the OEM such as Delphi.  <u>See</u> App. Rec. No. 6 at ¶ 7.  Each time a car or truck assembled by the OEM goes through the paint shop, the OEM triggers an order to Automodular to sub-assemble the components it is responsible for producing for the next vehicle entering the OEM's production line.  <u>See</u> <u>Id</u>.  Automodular typically has less than two hours to sub-assemble and deliver a particular module from the time it receives an order from an OEM.  Since the OEM's assembly plant is typically producing at a line rate of over 60 jobs per hour, Automodular receives orders for a given component for a particular vehicle type every minute during the period while the OEM's assembly line is operating.  <u>See</u> <u>Id</u>.  In short, Automodular's line must operate at the same speed or rate as the OEM's line. <u>See</u> Transcript of Deposition of Michael Blair with exhibits, dated February 13, 2008 (hereinafter "Blair Dep. Tr.") at pp. 93-94 (App. Rec. No. 10). Any changes in the OEM line require mirror changes in Automodular's line.  <u>See</u> <u>Id</u>.

With respect to Delphi, Automodular sub-assembles and sequences components known as compressor-fan-radiator modules ("CRFM").  <u>See</u> App. Rec. No. 6  at ¶ 7.  Sub-assembly is the process of putting together the module from its constituent parts.  <u>See</u> <u>Id</u>.  Sequencing means delivering each module in the order it will be assembled into the vehicles being produced at the OEM's facility, such that the first module delivered is directed at the vehicle immediately being

2

assembled at the point of delivery, and the next module for the immediately following vehicle, and so forth.  See App. Rec. No. 6  at ¶ 9.

Automodular contracts with OEM or Tier 1 suppliers such as Delphi following these steps:

a. Automodular receives from a potential customer a statement of work setting out the sub-assembly requirements for the modules to be quoted, and a request for quotation ("RFQ"), asking Automodular to state at what price and on what terms it is willing to carry out the work;

b. Automodular prepares a "technical review" of how it proposed to carry out the work and reviews this with the customer to ensure there is a common understanding of what is required and how it will be carried out;

c. Automodular sends a formal letter of quotation setting out the price and terms under which it proposes to carry out the work (including the volume and rate of manufacture);

d. The customer advises Automodular whether it accepts all or some of the terms quoted and where required Automodular issues an amended letter of quotation;

e. The customer then awards the business by issuing to Automodular a purchase order or purchase orders and refers Automodular to its General Terms and Conditions for supply agreements;

f. Some contracts go a step further and include a long term agreement that references additional terms.

See Id. at ¶ 16.

Automodular had two contracts at issue with Delphi to provide sub-assembly and sequencing of CRFMs at two different locations:  Lordstown (Ohio, U.S.) and Oshawa (Ontario, Canada).  See Id. at ¶¶ 8, 18.

## II.    The Formation of the U.S. Contract for Lordstown

In August 2003, in response to a Delphi RFQ, Automodular provided Delphi with a pricing bid that assumed a quoted volume and that the work would be produced on 2 shifts without overtime.   See Id. at ¶ 20.  The conditions of Automodular's quote clearly stated that

3

any variation over 10% of the quoted volume provided by Delphi would require a price adjustment.  See Id.; Id. at Exhibit B.

In September 2003, Delphi informed Automodular that the project would require three shifts rather than two and asked Automodular to submit a new bid under the new parameters. Automodular did so.  See Id. at ¶ 22; Id. at Exhibit C.  After further negotiations,  Automodular agreed to adjust its pricing to $3.42 per unit, for 3 shifts, noting that variations of 10% on the yearly volumes provided by Delphi would require price adjustments.  See Id. at ¶ 22; Id. at Exhibit C.  In June 2004, Delphi issued purchase orders accepting Automodular's quote to provide services to Delphi at the Lordstown facility.  See Id. at ¶ 23.

The purchase orders included very sketchy information, covering the number describing the module, the name of the module (e.g., CRFM-AYM-07), the unit price for the assembly of the module, and, with respect to quantity, a notation stating: "This Requirement Contract is for 100% unless otherwise specified."  See Id. at Exhibit C.  In the form language on the back of the purchase order, Delphi incorporated its General Terms and Conditions.  See Id.  No other documents bearing on the formation of this contract were exchanged between the parties.  See generally Id.  By itself, the purchase order did not include the details required to understand either the scope of work, specifications, or production conditions of the work to be performed by Automodular.  See Id. at ¶18.  Delphi's own witness, Michael Bauman, admitted that the purchase orders do not include such details, but they would be found in the RFQ.  See Transcript of Deposition of Michael Bauman with exhibits, dated February 18, 2008 (hereinafter "Bauman Dep. Tr."), at pp. 21-22 (App. Rec. No. 9).

4

### III.    The Formation of the Ontario Contract for Oshawa

With respect to the Oshawa Contract, the parties exchanged bid/RFQ documents in early 2000.  See App. Rec. No. 6 at ¶ 25.  In March of 2000, Automodular provided a quote based on Delphi's RFQ package, including volume estimates, and estimated floor space, manpower and capital/tooling.  See Id.  Automodular provided a revised bid in August of 2000 with a selling price and based on a 2 shift situation for two car lines.  See Id.  Delphi then revised its business assumptions and the parties exchanged documents clarifying the bid and discussed the proposed work at Oshawa in September 2000.  See Id.

As of October 2000, Automodular's bid was based on a two shift, straight time, annual volume.  See Id. at ¶ 26.  On October 19, 2000, Delphi accepted Automodular's bid and awarded the contract to Automodular.  See Id. at ¶ 27.  The work was delayed, but eventually Automodular began performing under the negotiated contract upon the terms set forth in its bid. See Id. at ¶ 28.

In addition, in June 2005, Automodular contracted with Delphi under a three-page Long Term Contract (or "LTA") with a term from July 1, 2005 to June 30, 2010 for services at the Oshawa location.  See Id. at ¶ 29.  The LTA required that Automodular set up capacity sufficient to handle 83 jobs per hour.  See Id. at Exhibit I.  Although the LTA was signed in June of 2005, the parties had already exchanged a request for quote, various bids and a formal acceptance by Delphi.  See Id. at ¶ 30.  The acceptance letter by Delphi specifically confirms the award of the contract to Automodular with prices specified and acceptance of Automodular's currency exchange provision.  See Id. at Exhibit I.  Upon acceptance of the final bid by Automodular, a contract for work to be performed was formed, and Automodular had already started operating in reliance on the accepted quote.  See Id. at ¶ 28.  The LTA was not intended to supersede the

quote and acceptance.  See Id. at ¶¶ 26-30.  Again as with the Lordstown contract, the three-page LTA did not include details necessary to explain the scope of the work, specifications and production conditions.  See generally Id. at Exhibit I.

The Lordstown contract (through the purchase orders) and the Oshawa contract (through the LTA) incorporate Delphi's "General Terms and Conditions," which were ***drafted by Delphi***. See Id. at Exhibit E; Id. at Exhibit I.  Pursuant to Section 3 of the General Terms and Conditions, Delphi could require Automodular to implement changes to the specifications or design of the goods ***or to the scope of any services*** covered by the contract.  See Id. at ¶ 38; Id. at Exhibit K. Upon such changes, an equitable adjustment to the price had to be negotiated.

## IV.    **Changes in Scope Generally**

"Scope change" is a term of art in the automotive industry that includes the following changes: (a) change in content; (b) change in line speed which requires re-balancing the lines; (c) change in number of shifts; and/or (d) change in volume of cars to an extent that it affects the spread of fixed costs.  See Id. at ¶34; See App. Rec. No. 10 at pp. 30-31, 34, 100 and 116.

Since only the OEM can change the number of shifts during which vehicles will be produced, or the line speed at which they will be produced, or the content of the components it is buying from its Tier 1 suppliers, changes of scope affecting Automodular's work are typically directed and issued by the OEM and not by Tier 1 customers such as Delphi.  See App. Rec. No. 6 at ¶ 36.

In the case of Automodular's contracts with Delphi, scope changes were ordered by GM and were implemented at both Oshawa and Lordstown.  See Id. at ¶ 37; Id. at Exhibit J (Scope Change forms from GM).

## V.    The Changes In Scope

### A.    The Lordstown Changes in Scope

On September 26, 2006, GM issued Scope Change Forms to Automodular, describing the following changes as "scope changes:"

- shifts were reduced from 3 shifts to 2 shifts (to be implemented as of July 2006);

- Decrease in line speed from 1296 cars per day to 1008 (as of July 2006)

- Increase in line speed from 1008 cars per day to 1100 (as of September 2006)

- shifts were lengthened from 8 hours per shift to 9 hours per shift (as of September 2006)

- Increase in line speed from 1100 to 1136 per day (as of November 2006)

- Increase in line speed from 1136 to 1154 per day (as of January 2007)

See Id. at Exhibit J.

Based on the change of scope from 3 shifts to 2 shifts and an increase in line rate from 54 net jobs per hour to 63 net jobs per hour, Automodular provided a pricing adjustment to Delphi. See Id. at ¶ 46.  Automodular notified Delphi that changes to the number of shifts, hours per shift and net jobs per hour constituted a change in scope and required pricing adjustments.  See Id. The price adjustment was **not** related to an increase in labor costs, materials, overhead or other costs (which the contract prohibited), but rather addresses the changes in the scope of services to be provided under the contract. See Id. at ¶¶ 45-46.

### B.    The Oshawa Changes in Scope

On December 6, 2005, February 22, 2006 and May 11, 2006, GM issued three Scope Change Forms to Automodular with respect to work done under the Oshawa contract.  See Id. at Exhibit W.  The changes were as follows:

7

(a)    With respect to Car # 1, the work was:

   (i)    de-rated from 66.875 net jobs per hour  to 61.5 jobs per hour, and

   (ii)    de-rated to 59.5 net jobs per hour.

(b)    With respect to Car # 2, the work was:

   (i)    de-rated from 65 net jobs per hour to 63.25 jobs per hour (as of end of January 2006);

   (ii)    de-rated to 55 jobs per hour as of May 8, 2006; and

   (iii)    de-rated to 45.4 jobs per hour  as of February 26, 2007.

See Id. at ¶¶ 56-59; Declaration of Christopher Dell dated February 15, 2008, including all exhibits thereto (hereinafter "Dell Dec.") at ¶¶ 27-35 (App. Rec. No. 7).

These de-rates forced Automodular to change its production process resulting in a change in pricing on a per piece basis.  See App. Rec. No. 6 at ¶¶ 57-59.  As a result, Automodular requested a price increase to Delphi pursuant to Section 3 of the General Terms & Conditions. See Id. at ¶ 59.  Delphi, however, refused to negotiate any price increase.

8

## STATEMENT OF ISSUES ON APPEAL

(1)    Whether the Bankruptcy Court erred in its interpretation of the contracts?

(2)    Whether the Bankruptcy Court erred in finding that the contracts were clear and unambiguous?

(3)    Whether the Bankruptcy Court erred by disregarding any and all extrinsic evidence and/or parol evidence in the interpretation of the parties' intent under the contracts?

(4)    Whether the Bankruptcy Court erred in finding that the only changes that occurred under the contracts was a change in the volume of the debtors' requirements?

## STANDARD OF APPELLATE REVIEW

"A district court hearing an appeal from a bankruptcy court reviews the bankruptcy court's findings of fact under the 'clearly erroneous' standard, see Fed. R. Bankr.P. 8013, while its conclusions of law are reviewed under the de novo standard."  In re Yohannes, 2007 WL 2034301, at *2 (S.D. N.Y. July 17, 2007) (quoting In re Bennett Funding Group, Inc., 146 F.3d 136, 137 (2d Cir. 1998)).  All of the issues presented to the Court in this appeal deal with the Bankruptcy Court's interpretation of the contracts and are therefore subject to de novo review. Klapp v. United Ins. Group Agency, Inc., 663 N.W.2d 447, 451 (2003).[1]

---

[1] The parties to the present dispute, as well as the Bankruptcy Court, have acknowledged that Michigan law applies to the Contracts.

9

# LEGAL ARGUMENT

## POINT I

### THE BANKRUPTCY COURT
### <u>MISINTERPRETED THE CONTRACTS</u>

1.    <u>The Bankruptcy Court Erred in Reading Section 3 as Covering Only Changes in the Nature of the Product Being Assembled</u>

The Bankruptcy Court misinterpreted Section 3 of the General Terms & Conditions by reading limiting words into the Section where none existed.  The law is clear that a court cannot read into an agreement terms that have not been placed there by the parties.  <u>See</u>, <u>e.g.</u>, <u>Cotrill v. Michigan Hosp. Service</u>, 102 N.W.2d 179, 181-182 (1960) (observing that courts must refrain from "reading into the contract a provision not contained therein").  As such, the Bankruptcy Court committed legal error and should be reversed.

In relevant parts, Section 3 provides as follows:

Specification, Design and Scope Changes

> Buyer may at any time require Seller to implement changes to the specifications or design of the goods <u>or to the scope of any services or work covered by this Contract,</u> including work related to inspection, testing or quality control…   Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes…

App. Rec. No. 6 at Exhibit K (Section 3) (emphasis added).

The Bankruptcy Court interpreted the phrase "changes … to the scope of any services or work covered by this Contract" as requiring a change in the nature of the product being assembled.   <u>See</u> Order Denying the Motion of Automodular Assemblies, Inc., Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc. to Compel Assumption or Rejection of Executory Contracts and Allow and Direct Payment of Administrative Expense Claim and Exhibit A thereto (Docket No. 12932), at Exhibit A pp. 6 and 15 (App. Rec. No. 37).

ME1 7333524v.1

The language of Section 3, however, does <u>not</u> limit the changes to only changes in the nature of the product being assembled.  The language used in Section 3 is very broad and covers changes to the scope of "any services or work covered" by the contract.  When Delphi, as the drafter of the General Terms and Conditions, wanted to use language specific to the nature of the goods, it did so explicitly by referencing changes in the "specifications or design of the goods."  No such language was used in connection with the phrase "any services or work covered by this Contract."  In fact, the Bankruptcy Court's interpretation renders the phrase "change … to the scope of any services or work" superfluous because changes in the nature of the product are already covered by the phrase "changes to the specifications or design of the goods."  The Bankruptcy Court's interpretation thus runs afoul of the judicial preference for giving meaning to all the terms of a contract.  <u>See</u>, <u>e.g.</u> <u>Century Sur. Co. v. Charron</u>, 583 N.W.2d 486, 488 (1998).

Moreover, the examples included after the phrase dealing with changes in the scope of services (i.e., "work related to inspection, testing or quality control") do not support the Bankruptcy Court's interpretation either.  All those examples relate to work that do not directly change the nature of the goods being assembled.  The examples simply relate to types of tasks to be performed as part of the assembling work.  By similar logic, changes in the speed of the assembly line or the numbers of hours in each shift or the numbers of shifts per day must necessarily be covered too under the broad changes in the scope of any services language in Section 3.  Consequently, there is no textual support for the Bankruptcy Court's interpretation of Section 3, which violates well accepted canons of contract interpretation.

2.    <u>The Bankruptcy Court misinterpreted section 2.5 and 2.7 of the Contracts.</u>

The Bankruptcy Court sought support for its interpretation of the Contracts by reading Sections 2.5 and 2.7 of the General Terms as limiting the language of the scope change provision

in Section 3.  There is no language in Sections 2.5 or 2.7 that carves out exceptions or limitations to Section 3 changes in the scope of services or work.  Neither of those two sections references Section 3 in any of its sentences.  In contrast, when Delphi, as the drafter, wanted to note limitations in a section by referencing another, it certainly knew how to do so.  In fact, there are several examples of sections cross-referencing other sections throughout the General Terms & Conditions to effectuate carve outs.  See, e.g., App. Rec. No. 6 at Exhibit K (Sections 7.2, 7.4; 10 and 12.1).

Moreover, Sections 2.5 and 2.7 do not preclude the potential price adjustment covered by Section 3.  Section 2.5 deals with delivery schedules. The Bankruptcy Court focused on the following language: "If the requirement of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments without entitling Seller to a price adjustment or other compensation."  Id. (Section 2.5) (emphasis added).  By its express terms, Section 2.5 does not deal with a permanent change that affects the scope of work.  See generally Id.  It simply deals with the rate of shipments or temporary suspensions of shipments.

Mr. Blair, Automodular's CEO, explained the purpose behind Section 2.5 at his deposition:

> Q:   How can you have a volume reduction without having a line rate reduction as well.
>
> A:   Shut down for a week, have strike, have a bottleneck in the final assembly plant and be out for two hours.
>
> Q:   I am referring here to a reduction in the number of orders by General Motors, for example, for CRFMS. That would reduce the volume or output of Automodular, wouldn't it?
>
> A:   Sure. If their paint shop gets blocked up and they can't produce vehicles, they are going to stop triggering orders.

12

> Q:    Wouldn't that, in your view, trigger a request for a per piece price review?
>
> A:    No. In the my view, those minor day-to-day fluctuations will never fall outside of the broad band that we have….

App. Rec. No. 9 at p. 31.

The Bankruptcy Court rejected this interpretation because in its view the section went far beyond any specific limitation.  See App. Rec. No. 37 at Exhibit A at p. 14.  Section 2.5, however, does not speak to overall volume changes or order changes or other changes affecting the scope of work or services.  See generally App. Rec. No. 6 at Exhibit K (Section 2.5).  It deals only with the speed of deliveries or with temporary suspensions.  By its own terms, the Section does not preclude price adjustments by an overall change in volume that triggers changes in the scope of work or services.

Moreover, Section 3 changes should trump the language of Section 2.5 since Section 3 specifically provides for price and delivery schedule adjustments for scope changes.  See, e.g., Skarina v. AllState Ins. Co., 2005 WL 900552, at *4 (Mich. App. April 19, 2005) ("In construing contracts, general provisions will yield to specific provisions.") (citations omitted).  At best, the interplay between Section 2.5 and Section 3 creates an ambiguity that the Bankruptcy Court could not resolve as a matter of law and without admitting parol evidence, as demonstrated below in Point II.  Moreover, to the extent the ambiguity could have been resolved, it should have been resolved against Delphi as the drafter of the document.  See Klapp, 663 N.W.2d at 455.

The Bankruptcy Court also interpreted Section 2.7 as precluding Automodular's change of scope claim.  Section 2.7 deals with volume forecasts.  See generally App. Rec. No. 6 at Exhibit K (Section 2.7).  It provides that such forecasts may be produced simply for

13

informational purposes and that Delphi makes no commitments or warranty with respect to such forecasts. This language does not foreclose the possibility of price adjustments upon changes in scope of services that may result from a change in overall volume. Section 2.7 does not commit Delphi to buy a certain volume of services or goods, but upon certain changes, Delphi committed itself to revisit pricing. Section 2.7 is conspicuously silent about pricing. <u>See</u> <u>Id</u>. The Bankruptcy Court thus erred in holding that Section 2.7 precluded Automodular's claim.

With respect to the Lordstown Contract, Automodular never countersigned the purchase orders issued by Delphi in response to Automodular's offer for its services. The purchase orders incorporated the terms of Delphi's General Terms & Conditions. To the extent terms in the General Terms & Conditions contradict or conflict with the terms in Automodular's offer, those terms cannot be deemed binding on Automodular. <u>See</u>, <u>e.g.</u>, <u>Wiseco, Inc. v. Johnson Controls, Inc.</u>, 155 Fed. Appx. 815, 816 (6th Cir. 2005) (agreement was ratified by issuance of purchase order, but it was not controlled by the terms of the purchase order). Thus, at the very least, with respect to the Lordstown contract, the matter should be remanded to determine what the agreement was in connection with changes in the speed of the line, number of shifts and hours per shift.

3.    <u>The Bankruptcy Court Misinterpreted Section 3 of the Ontario Contract.</u>

Section 3 of the Ontario Contract provides in pertinent part:

No price increases… will be made on account of (i) Seller's failure to achieve any expected cost savings and productivity improvements or (ii) any increases in Seller's labor, materials, overheard and other costs…

App. Rec. No. 6 at Exhibit I.

The Bankruptcy Court misinterpreted this section and erroneously found that Automodular's claim involved an increase in its labor. Automodular's claim, however, is <u>not</u>

14

based in any increase in its overhead, materials or labor. This section deals with cost increases that are not within the control of the buyer. The changes at issue here were at the request of the buyer arising from a change in the contract terms demanded by the buyer. As explained in Automodular's papers and during oral argument before the bankruptcy court, Automodular's costs are fixed. See App. Rec. No. 6 at ¶ 12; Transcript from the hearing on the Motion held on February 21, 2008 before the United States Bankruptcy Court for the Southern District of New York (hereinafter "Motion Hearing Tr.") at 80-81 (App. Rec. No. 36). The labor cost did not increase. Automodular did not ask Delphi to share on increases in the wages paid to its workers. In fact, Delphi's own witness, Mr. Conely, admitted that a reduction in the number of shifts does not mean an increase in labor costs. Similarly, he acknowledged that it is not necessarily an increase in overhead or in material costs either. See Transcript of Deposition of Greg Conley with exhibits, dated February 18, 2008 (hereinafter "Conley Dep. Tr.") at pp. 54-55 (App. Rec. No. 8). This clause, upon which the Bankruptcy Court relied, has no bearing on the present dispute. Therefore, the Bankruptcy Court's reliance on it to justify its interpretation of Section 3 of the General Terms and Conditions constituted legal error.

4.    The Bankruptcy Court Misinterpreted the Nature of Automodular's Claim.

The Bankruptcy Court misinterpreted the nature of Automodular's claim by believing that it was based simply on a change of volume. Contrary to the Bankruptcy Court's impression, Automodular's position was not that the parties agreed to a specific guaranteed cost to Automodular upon a given agreed volume.

Admittedly, Automodular's bid to Delphi was for a price with a certain flexibility for volume variations. There were no guaranteed costs in the parties' agreement, however. The agreement assumed a certain number of shifts, hours per shift, and a certain number of jobs per

hour.  See App. Rec. No. 6 at Exhibit B; Id. at Exhibit D.  The parties agreed to a mechanism to adjust pricing upon changes to those basic assumption.  All those assumptions that went to the extent of the work to be done under the contract were changed.

The changes were related to an overall decrease in the volume, but the scope change claimed by Automodular was not necessarily tied to the decrease in volume.  As Mr. Blair explained, a reduction from three shifts to two shifts is a change in scope, but it does not necessarily require a change in volume.  See App. Rec. No. 10 at pp. 31, 46-47.  If the same volume may be produced in only two shifts without additional staffing, then the saving from the eliminated shift could result in a price adjustment in favor of the buyer.  See Id. at pp. 46-47.  This example illustrates that the nature or scope of the service is altered upon a change in the way the service or the work is performed, and is different (albeit sometimes related) from a change in volume.  It is a fundamentally different service to assemble at a rate of 10 jobs/hour on an 8 hour shift than to do so at 9 jobs/hour in a 9 hour shift, regardless of the volume being produced.  Job functions have to be redesigned; work-space may change; employment levels may change; and other factors may need to be adjusted.  The Bankruptcy Court failed to see the distinction and erroneously focused on volume changes.

Since it focused on volume, the Bankruptcy Court mistakenly sought support for its conclusions in cases dealing with requirement contracts under the Uniform Commercial Code (UCC).  Initially, it must be understood that the UCC is inapplicable to this dispute as the contracts do not deal with the sale of goods, but with the sale of services (e.g., assembling).  See UCC Articles 2-102 and 2-106.  Secondly, the fact that a buyer under the UCC may, in good faith, reduce its requirements to zero without breaching a requirement contract is not really relevant to this dispute.  The issue here is not that Delphi stopped buying the services altogether.

16

The issue is <u>not</u> that the volume was reduced. The issue is that the service was altered and the parties had agreed to adjust pricing upon such a change.

**POINT II**

**THE BANKRUPTCY COURT ERRONEOUSLY**
<u>**HELD THAT THE CONTRACTS WERE UNAMBIGUOUS**</u>

The Bankruptcy Court erred in its interpretation of the Contracts because it held that the Contracts were clear and unambiguous. As a matter of Michigan law, a contract can be determined to be clear and unambiguous only "if, however inartfully worded or clumsily arranged, it fairly admits of but one interpretation." <u>See</u> <u>T&S Dist., L.L.C. v. Mich. Bell Tel. Co.</u>, 2008 WL 724084, at *4 (Mich. App. Mar. 18, 2008) (citing <u>Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel</u>, 596 N.W.2d 915 (1999)). A contractual term is ambiguous "when [a term] is equally susceptible to more than a single meaning." <u>See</u> <u>Coates v. Bastian Bros., Inc.</u>, 741 N.W.2d 539, 543 (Mich. App. 2007) (citing <u>Lansing Mayor v. Pub. Service Comm.</u>, 680 N.W.2d 840 (2004)). Stated another way:

> "[a] contract is ambiguous if a genuine doubt appears as to its meaning, that is if, after applying established rules of interpretation, the written instrument remains reasonably susceptible to at least two reasonable but conflicting meanings, when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement, <u>and who is cognizant of customs, practices, usages, and terminology as generally understood in the particular trade or business.</u>"

<u>Vicars v. Environ. Potentials, Inc.</u>, 2007 WL 2952453, at *3 (E.D. Mich. Oct. 9, 2007) (<u>quoting</u> 11 Samuel Williston & Richard A. Lord, <u>A Treatise on the Law of Contracts</u> § 30:4 at 39 (4th ed. 1999)) (emphasis added).

The Contracts do not define what a scope change means. "Scope" is defined in Webster's Dictionary as the "extent of treatment, activity or influence." The Bankruptcy Court

17

found that "scope change" referred to a change in the nature of the product. Although, as shown above, this interpretation is problematic, it represents one possible interpretation of the phrase. The Debtors offered a variation on the Bankruptcy Court's interpretation by arguing that the phrase required some type of additional work to the one contracted. This would be a second interpretation of the phrase, which like the Bankruptcy Court's suffers from the defect that it adds a term (i.e., "additional") to the phrase that is nowhere to be found in the document. Finally, in Automodular's interpretation, a "change in scope" refers to changes in the specifications that were outlined by Delphi in its RFQ and agreed by Automodular in its bids. Those specifications defined the scope of the work by indicating the number of shifts, jobs per hour and hours per shift. When these specifications changed prior to the allocation of a contract, Delphi requested new bids. Under the same logic, when the variables changed after the formation of the Contracts, Section 3 operated as the vehicle to negotiate equitable price changes. Certainly, such changes would fit the dictionary definition of the term "scope." The extent of Automodular's service was one at a certain assembly line speed and the extent of the service changed upon the required modification to the speed of assembly. This interpretation is consistent with general industry understanding of the phrase "scope change." See Point III below.

Clearly, there is more than one reasonable interpretation to the phrase "scope change." The determination of which interpretation should prevail, however, cannot be achieved by looking exclusively at the purchase orders for the U.S. Contract, the Long Term Agreement for Canada or the General Terms & Conditions. Thus, the Contracts meet the legal definition of ambiguity. Consequently, the Bankruptcy Court committed a legal error in finding the contracts unambiguous and in refusing to accept extrinsic evidence to resolve the ambiguity.

# POINT III

## THE BANKRUPTCY COURT ERRED BY
## FAILING TO CONSIDER EXTRINSIC EVIDENCE.

Given that the Contracts are ambiguous, the Bankruptcy Court erred in failing to consider the extrinsic evidence that was part of the record to properly interpret the meaning of the phrase "scope change" in Section 3 of the General Terms & Conditions.

Extrinsic evidence is admissible and necessary to interpret an ambiguous or incomplete contract. Under Michigan law, extrinsic evidence is admissible for the purposes of interpreting an ambiguous agreement. See, e.g., Tel-Towne Prop. Group v. Toys "R" Us-Delaware, Inc., 2007 WL 2572031, at *4 (E.D. Mich. Sept. 5, 2007) ("If, however, the contract language is ambiguous, the court may consider extrinsic evidence to ascertain the parties' intent or to determine whether there is a latent ambiguity.") (citing Glenwood Shopping Ctr. Limited Partnership v. K Mart Corp., 356 N.W.2d 281 (1984); Henry v. J.B. Publishing Co., 221 N.W.2d 174 (1974); Wonderland Shopping Center Venter Limited Partnership v. CDC Mortgage Capital, Inc., 274 F.3d 1085 (6th Cir. 2001)). Further, even in the context of a fully-integrated agreement, extrinsic evidence is admissible to construe the meaning of ambiguous terms or provisions. See Hesse v. Superior Bus. Forms, Inc., 2008 WL 441603, at *3 (Mich. App. Feb. 19, 2008) (citing 6 Corbin, Contracts (Revised ed.), § 578, p 119).

In addition to being admissible for the purposes of interpreting an ambiguous agreement, extrinsic evidence is also admissible for ascertaining whether there is a latent ambiguity which is not apparent from the face of the agreement. See, e.g., Scholz v. Montgomery Ward & Co., Inc., 468 N.W.2d 845, 853 (Mich. 1991) ("A latent ambiguity is one where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous

19

evidence creates a necessity for interpretation or a choice among 2 or more possible meanings.")
(citations and punctuation omitted) (Levin, J., concurring in part, dissenting in part).  "[W]here a
word or phrase is used in a particular sense as applicable to a particular trade, business, or
calling…it is proper to receive extrinsic evidence to explain or illustrate the meaning of that
word or phrase."  T&S Dist., L.L.C., 2008 WL 724084, at *10 (quoting Moraine Products, Inc.
v. Parke, Davis & Co.  203 N.W.2d 917 (Mich. App. 1972)).

In this regard, as part of the record before the Bankruptcy Court, Automodular offered the
testimony of Mr. Blair, the company's CEO, showing that "change of scope" is a concept or term
commonly used in the automotive industry to cover the type of changes at issue in this dispute
(i.e, reduction in shifts, modification in the number of jobs per hour, modification in the number
of hours per shift).  Mr. Blair testified that in his twenty year experience in the automotive
industry, changes in scope are those that change in a fundamental way the capability to serve that
the assembler puts in place.  Upon such changes, parties in the industry expect to adjust pricing.
See App. Rec. No. 10 at pp. 30-31 ("But if you fundamentally change the structure, I'm going to
produce two shifts instead of three, I am going to produce at 60 jobs per hour instead of 80 jobs
per hour… then … in my view, and certainly in my 20 years of history and in all of our
customers' view that we're going to revisit the economics both ways."); Id. at p. 34 ("every time
[a demand to add a shift] has occurred in our history, the customer will reopen the price to obtain
that benefit and we'll accept it because it is in the nature of our agreement with them); Id. at p.
100 ("the process in Ford is when a scope change is implemented, the pricing is automatically
implemented and put through with no discussion"); Id. at p. 116 ("If they [GM] issue a scope
change form and … tell us what the scope change is, then that is a scope change.").

Supporting Mr. Blair's testimony were the "Change of Scope" forms issued by GM in connection with the production lines in Ohio and Ontario covered by the Contracts between Automodular and Delphi.  The forms describe the following as a scope change:  (1) a reduction in the number of shifts from three to two; (2) a change in the number of hours per shift from eight to nine; (3) an increase in the line speed (i.e., jobs per hour). <u>See</u> App. Rec. No. 8 at Exhibit 6.  From such evidence, the Bankruptcy Court should have found that "scope change" is a term of art in the industry with a meaning that encompasses the changes that Automodular was directed to implement.

In contrast, Delphi produced no competent witness to testify about the meaning of "scope change."  Mr. Conely, for instance, testified that he was not familiar with the term and that he could not speak for the auto industry to answer whether the term was used in the industry or not. <u>See</u> App. Rec. No. 8 at pp. 70-71.  Similarly, Mr. Bauman, the only other witness to appear for Delphi, also testified that he was not familiar with the term "scope change," and could not even remember until shown the document, that it was a term used in Delphi's own General Terms and Conditions. <u>See</u> App. Rec. No. 9 at pp. 34-35.

In short, had the Bankruptcy Court considered the extrinsic evidence that was part of the record, it should have had to find in favor of Automodular that Delphi refused to even consider price adjustments upon the scope changes that had occurred.  Such refusal was a breach of the parties' Contracts, which resulted in damages to Automodular.

ME1 7333524v.1

## CONCLUSION

For the aforementioned reasons, the Order of the Bankruptcy Court must be reversed. The matter should be remanded with instructions to admit the extrinsic evidence presented by Automodular.

/s/ Eduardo J. Glas
Eduardo J. Glas, Esquire (# EG7027)
MCCARTER & ENGLISH, LLP
245 Park Avenue
27th Floor
New York, New York  10167
(212) 609-6800 - Telephone
(212) 609-6921 - Facsimile

and

Katharine L. Mayer, Esquire
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19899
(302) 984-6300 - Telephone
(302) 984-6399 - Facsimile

Attorneys for Automodular Corporation f/k/a
Automodular Assemblies Inc., Tec-Mar
Distribution Services, Inc., and Automodular
Assemblies (Ohio) Inc.

DATED: May 12, 2008