SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
Albert L. Hogan, III (AH 8807)
Francis Neil MacDonald (FM 4308)

　　　　- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)

Attorneys for Appellee, Delphi Corporation, et al.,
　　Debtors and Debtors-in-Possession

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | |
| AUTOMODULAR CORPORATION a/k/a AUTOMODULAR ASSEMBLIES INC., | : | Dist. Case No. 08-CV-3752 (VM) |
| | : | |
| Plaintiff/Appellant, | : | |
| | : | |
| - against - | : | |
| | : | |
| DELPHI CORPORATION, et al., | : | |
| | : | |
| Defendant/Appellee. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BRIEF OF APPELLEE DELPHI CORPORATION, ET AL. IN OPPOSITION TO
APPEAL OF AUTOMODULAR ASSEMBLIES INC., TEC-MAR DISTRIBUTION
SERVICES, INC., AND AUTOMODULAR ASSEMBLIES (OHIO) INC.

("APPELLEE'S BRIEF")

<u>FED. R. APP. P. 26.1 STATEMENT</u>

The following is a list of parent companies, subsidiaries, and affiliates of Delphi

Corporation and certain of its subsidiaries and affiliates, including Delphi Automotive Systems LLC,

debtors and debtors-in-possession in the above-captioned cases, that have issued shares to the public:

Delphi Corporation

## TABLE OF CONTENTS

Preliminary Statement....................................................................................................1

Statement Of Appellate Jurisdiction ..............................................................................3

Statement Of The Issues On Appeal ..............................................................................3

Standard Of Appellate Review ......................................................................................4

Statement Of The Case And Procedural Posture ...........................................................4

Statement Of Facts .......................................................................................................7

ARGUMENT ...............................................................................................................10

I.      The Contracts Are Requirements Contracts That Provide For Fixed Per-Piece Prices
        And Do Not Include A Provision For Pricing Variance Based On Changes In
        Volume................................................................................................................10

II.     The Bankruptcy Court Properly Interpreted The Contract As A Whole, Including
        Section 3 Of The General Terms And Conditions...............................................13

III.    Automodular Must Be Bound By The Terms Of the Contracts It Entered, And
        Cannot Rely On Extrinsic Terms ........................................................................19

IV.     The Unauthenticated, Extrinsic Evidence On Which Automodular Relies Is Hearsay.....21

Conclusion ...................................................................................................................23

TABLE OF AUTHORITIES

CASES                                                                                              PAGE(S)

ACEquip Ltd. v. Am. Eng'g Corp., 315 F.3d 151 (2d Cir. 2003)....................................4

Anderson v. Bessemer City, 470 U.S. 564 (1985)........................................................4

Angelica Uniform Group, Inc. v. Ponderosa Sys., Inc., 636 F.2d 232 (8th Cir. 1980) ...............12

Atlantic Track & Turnout Co. v. Perini Corp., 989 F.2d 541 (1st Cir. 1993) ...................11, 12

Barnes v. Prudential Ins. Co., 76 F.3d 889 (8th Cir. 1993) ...................................22, 23

Brewster of Lynchburg, Inc. v. Dial Corp., 33 F.3d 355 (4th Cir. 1994).......................12

Browning v. MCI, Inc. (In re WorldCom, Inc.), 339 B.R. 836 (S.D.N.Y. 2006)..........................4

Cole v. Auto.-Owners Ins. Co., 723 N.W.2d 922 (Mich. Ct. App. 2006) ....................................14

Gen. Elec. Co. v. Joiner, 522 U.S. 136 (1997)...............................................................4

Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp.,
        153 F.3d 61 (2d Cir. 1998) ……………………………………………………………20

Hunter v. Pearl Assurance Co., 291 N.W. 58 (1940)....................................................16

Ind. Lumbermen's Mut. Ins. Co. v. County of Luce, No. 236082,
        2002 WL 1277026 (Mich. Ct. App. June 7, 2002) ...........................................22

Inwood Labs. v. Ives Labs., Inc., 456 U.S. 844 (1982) ....................................................4

J & B Sausage Co. v. Dept. of Mgmt. & Budget, No. 04-000091-MK,
        2007 WL 28409 (Mich. Ct. App. Jan. 4, 2007) ..............................................11

NCC Sunday Inserts, Inc. v. World Color Press, Inc., 759 F. Supp. 1004 (S.D.N.Y. 1991).........12

In re Quality Prods., 666 N.W.2d 251 (Mich. 2003) ....................................................13

R.A. Weaver & Assocs., Inc. v. Asphalt Constr., Inc., 587 F.2d 1315 (D.C. Cir. 1978) ..............12

T&S Distribs., L.L.C. v. Mich. Bell Tel. Co., No. 274767, 2008 WL 724084
        (Mich. App. Mar. 18, 2008) ..................................................................13

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135 (2d Cir. 2001) ..................4

UAW-GM Human Res. Ctr. v. KSL Recreation Corp.,
    579 N.W.2d 411 (Mich. App. 1998)........................................................13, 14, 19, 20, 21

United States v. Abel, 469 U.S. 45 (1984).....................................................................4, 22

United States v. U.S. Gypsum Co., 333 U.S. 364 (1948)................................................4

Vesta Fire Ins. Corp. v. New Cap Reinsurance Corp.,
    238 F.3d 186 (2d Cir. 2001)..................................................................................20

Vicars v. Envtl.. Potentials, Inc., No. 06-12725, 2007 WL 2952453
    (E.D. Mich. Oct. 9, 2007) ................................................................................13, 16

Wiggins v. Orhanen, No. 264497, 2006 WL 3020259 (Mich. Ct. App. Oct. 24, 2006)...............19

Wiseco, Inc. v. Johnson Controls, Inc., No. 04-6200,
    2005 WL 2931896 (6th Cir. Nov. 4, 2005)........................................................12, 20, 21

<u>STATUTES</u>                                            <u>PAGE(S)</u>

Fed. R. Bankr. P. 8013 ........................................................................................................4

Fed. R. Evid. 801(c)............................................................................................................22

29 U.S.C. § 158(a) ..............................................................................................................3

<u>PRELIMINARY STATEMENT</u>

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, including

Delphi Automotive Systems LLC ("DAS LLC"), debtors and debtors-in-possession in the above-

captioned cases (the "Debtors"), submit this response brief in opposition to the appeal of

Automodular Assemblies Inc., Tec-Mar Distribution Services, Inc., and Automodular Assemblies

(Ohio) (collectively, "Automodular") from a March 3, 2008 order (the "Bankruptcy Court Order")

(SA 84-101) of the United States Bankruptcy Court for the Southern District of New York (the

"Bankruptcy Court") denying Automodular's motion to compel assumption or rejection of executory

contracts and allow and direct payment of administrative expense claim (Bankr. S.D.N.Y. Court

Case No. 05-44481, Docket No. 11180) (the "Motion").

This case involves alleged breaches by the Debtors of various requirements contracts

entered between Claimant-Appellant Automodular and DAS LLC, one of the Debtors-Appellees'

subsidiaries.  Under the terms of the contracts (respectively, the "Lordstown Contracts" and the

"Ontario Contracts," and together, the "Contracts"), the Debtors were obligated to purchase, and

Automodular was obligated to provide, 100% of the Debtors' requirements for an automobile part

called a Condenser Radiator Fan Module, or "CRFM."[1]  Automodular assembled the CRFMs for

the Debtors pursuant to the Contracts and then delivered the CRFMs to nearby factories owned and

operated by General Motors Corporation ("GM"), for inclusion in a variety of GM cars.

Automodular argues that it was contractually entitled to a per-piece price increase, at

the Debtors' expense, to account for costs associated with reductions in production volume at

---

[1]    In simplified terms, a "CRFM" is an automobile radiator and related engine cooling components.  Automodular assembles CRFMs from constituent parts for the Debtors and then delivers them to an original equipment manufacturer, or "OEM," for inclusion by the OEM in its finished cars.

Automodular's Lordstown and Ontario facilities.  Automodular further argues that it was entitled to similar per-unit price increases to account for losses associated with decreases in the rate of production at its Ontario facility.  Automodular sought payment of an administrative expense claim in the amount of these price increases.

The Bankruptcy Court properly rejected Automodular's interpretation of the Contracts, and denied its request for payment of an administrative expense claim.  The Bankruptcy Court's decision was based on a number of factually and legally sound considerations.  First, as the Bankruptcy Court found, Automodular's interpretation of the Contracts disregards the critical fact that the Contracts are requirements contracts.  The Bankruptcy Court recognized that it is customary in the auto industry for suppliers to enter into requirements contracts with their customers—that is, the customer promises to buy and the supplier promises to supply goods at a fixed price, with volumes or quantities to be determined based on the customer's good-faith requirements.  Those requirements, in turn, are based on the estimated number of cars that the buyer's customer, here, an original equipment manufacturer ("OEM"), believes it can sell.

Automodular argues that the Contracts at issue instead call for variable pricing, which would indicate that Automodular was free unilaterally to increase the prices it charged to the Debtors whenever GM required fewer CRFMs.  Although it would be possible for a customer and a supplier to enter a contract that provided for variable pricing, the Contracts at issue here do not contain any such provision.  Indeed, the Debtors' business would not survive if they entered into contracts on the terms Automodular requests here.  If suppliers could vary at will the price of the components they sold whenever the volumes changed, an OEM might be forced to change the price of the very same car from week to week.  Worse yet, if a Tier 1 supplier such as the Debtors (i.e., a supplier that sells parts and/or systems directly to an OEM) accepted anything but a requirements

2

contract with its suppliers (known as Tier 2 suppliers), the Tier 1 suppliers would become an insurance policy for the OEMs against volume declines, by being forced to absorb the costs associated with guaranteed volume contracts or variable price contracts, with no relief available from the OEMs.  Such a business model makes no sense and is not sustainable.  Nevertheless, Automodular has proposed such a contract in the present case.  Under such proposed terms, which would allow Automodular to increase prices, the Debtors would lose entirely their ability to project costs and to bid accurately on future work with OEMs or other customers.  Moreover, both the overall volume reduction and the change in the line speed are specifically addressed in the Contracts, and neither triggers a price adjustment.

The Bankruptcy Court's findings are fully supported by the record and applicable law, and the Bankruptcy Court Order should be affirmed.

<u>STATEMENT OF APPELLATE JURISDICTION</u>

Although Claimant-Appellant Automodular does not address the issue, this is an appeal from a final order of the Bankruptcy Court over which this Court has jurisdiction pursuant to 29 U.S.C § 158(a).

<u>STATEMENT OF THE ISSUES ON APPEAL</u>

1.      Did the Bankruptcy Court err when it found that the Contracts at issue were requirements contracts that, when read as a whole, specifically preclude the relief that Automodular seeks?

2.      Did the Bankruptcy Court abuse its discretion when it barred as hearsay unauthenticated evidence concerning third party contracts to which the Debtors were not a party, which contracts were not submitted to the Bankruptcy Court for its consideration?

## STANDARD OF APPELLATE REVIEW

The Bankruptcy Court's conclusions of law are subject to de novo review, see Browning v. MCI, Inc. (In re WorldCom, Inc.), 339 B.R. 836, 839 (S.D.N.Y. 2006), and its findings of fact are entitled to substantial deference under the clearly erroneous standard. Consequently, the Bankruptcy Court's findings of fact may be reversed only if this Court is definitely and firmly convinced that a mistake has been made. See id.; see also Fed. R. Bankr. P. 8013; United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948); U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135, 145-46 (2d Cir. 2001). When there are two permissible views of the evidence, including documentary evidence such as the Contracts, the Bankruptcy Court's choice between those views cannot be clearly erroneous. See Inwood Labs. v. Ives Labs., Inc., 456 U.S. 844, 857-58 (1982); Anderson v. Bessemer City, 470 U.S. 564, 574 (1985).

Evidentiary rulings are subject to an abuse of discretion standard of review. See General Electric Co. v. Joiner, 522 U.S. 136, 143 (1997); see also United States v. Abel, 469 U.S. 45, 54 (1984) (same). The trial court thus is accorded "wide discretion in determining the admissibility of evidence under the Federal Rules." Abel, 469 U.S. at 54.

It is well established that the decision of the trial court can be affirmed on any basis supported by the record, even if the trial court did not rely on the grounds on which the appellate court renders its decision. See, e.g., ACEquip Ltd. v. Am. Eng'g Corp., 315 F.3d 151, 155 (2d Cir. 2003).

## STATEMENT OF THE CASE AND PROCEDURAL POSTURE

On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended. Over two years later, on November 30, 2007, Automodular filed its Motion seeking payment of an administrative expense claim in connection with purported changes in the

4

scope of work performed under the Contracts.  On December 13, 2007, the Debtors filed their

Objection to the Motion (AD No. 1, Docket No. 11447) (the "Objection").[2]  Thereafter, on

February 1, 2008, Automodular filed a supplemental motion (the "Supplemental Motion") to

include additional detail regarding the allegations raised in the Motion.  (SA 1-9.)  The Debtors

filed an objection to the Supplemental Motion on February 14, 2008.  (AD No. 5, Docket No.

12661.)  On February 20, 2008, Automodular filed its reply brief in support of the Motion.  (SA

253-88.)

> The Bankruptcy Court conducted a hearing on the Motion and the Supplemental

Motion on February 21, 2008.  (SA 10-83.)  The court heard testimony from Chris Dell, Vice

President, Business Development, on behalf of Automodular, and considered the other evidence in

the record.  This included the declarations of Michael Blair, Automodular's Chief Executive Officer

(SA 102-16), and Mr. Dell (SA 153-65) in support of the Motion, and the declarations of Greg

Conley, Value Stream Extension Manager (SA 166-82), and Michael Bauman, Purchasing Manager

(SA 183-90), in opposition to the Motion, as well as a variety of e-mails, letters, and other

documents exchanged between the parties during the litigation, and deposition transcripts and

related documents produced during discovery.

---

[2]    For the Court's convenience, a supplemental appendix including copies of the significant documents cited herein will be provided with the courtesy copies of this brief that are delivered to the Court and counsel for Automodular (because the supplemental appendix contains confidential documents, it will not be filed electronically).  The supplemental appendix page number is referenced in the citations herein as "SA [●]."  The supplemental appendix also includes a copy of the Joint Exhibit Index of documents admitted into evidence and considered by the Bankruptcy Court, subject to the agreements and limitations described below in Appellee's Brief.  (SA 23.)  A list of items designated by Automodular for inclusion in the appellate record was filed on the docket of the United States Bankruptcy Court for the Southern District of New York, case number 05-44481, at docket entry number 13201.  The Debtors' appellate record designations appear as Bankruptcy Court docket entry number 13318.  For the Court's convenience, publicly-filed record items designated by Automodular ("AD") or the Debtors ("DD") referenced in this brief, but not included in the supplemental appendix, are cited by designator, designation number, description, paragraph or page, and docket number, as in, for example, " AD No. 4, Objection, Docket No. 11447."

Pursuant to stipulation, the parties agreed that certain contested portions of the Blair, Dell, and Conley declarations would be admitted only for non-hearsay purposes.  (SA 12, 23.)  In addition, Automodular attempted to introduce into the record certain putative "GM Scope Change Forms" that Automodular asserted it had received from GM in connection with contracts entered directly between GM and Automodular.  Because Automodular did not attempt to authenticate the GM Scope Change Forms, however, the Bankruptcy Court properly sustained the Debtors' objection to the introduction of this evidence and barred the GM Scope Change Forms admission as hearsay.  (SA 13-17.)  The parties subsequently agreed that the contested evidence could be considered only for non-hearsay purposes and would be afforded whatever evidentiary weight the court deemed appropriate.  (Id.)

After receiving evidence and following the conclusion of argument, the Bankruptcy Court found that the contracts in question were "very clearly requirements contracts" (SA 88), and that no such Contract obligates the Debtors, as Automodular had argued, "to bear the monetary cost of a reduction in its requirements."  (SA 100.)  Based on the evidence before it (SA 23), the court reasoned that "when one reads the contract as a whole, particularly noting that it's a requirements contract pursuant to which specific parts would be delivered at specific prices," Automodular's interpretation of the Contracts, including their "scope change" provision, "is clearly not what the parties intended."  (SA 92-93, 100.)  Moreover, because the Contracts contained an integration clause, the Bankruptcy Court found that there was no basis for looking to parol evidence to alter or amend the express terms of the Contracts.  (SA 94-95.)

Based on its findings of fact and conclusions of law, the Bankruptcy Court correctly concluded that Automodular was not entitled to payment of an administrative expense claim, and on March 3, 2008 entered an order denying the Motion.  (Id.)  On March 12, 2008, Automodular filed a

notice of appeal.  Although Automodular asserted a variety of claims in the Bankruptcy Court, the

issues in this appeal relate only to its claim for a price adjustment based on a reduction in DAS

LLC's Contract requirements.  The Bankruptcy Court's denial of Automodular's other claims,

including early termination charges, a currency exchange adjustment, and a rebate, are not at issue

here.

## STATEMENT OF FACTS

At all times relevant to this appeal, Automodular operated two factories that

assembled CRFMs for DAS LLC.  Automodular's facility in Oshawa, Ontario, Canada assembles

CRFMs for delivery to a nearby GM plant in Canada.  Until February 2008, Automodular's facility

in Lordstown, Ohio assembled CRFMs for delivery to a GM plant in Ohio.[3]  (SA 104, ¶ 8.)  GM

buys the assembled CRFMs from the Debtors and installs them in a variety of GM cars.  Although

Automodular assembles the CRFMs for the Debtors pursuant to the Contracts, Automodular

receives shipping instructions directly from GM.  (SA 103; SA 117-37; SA 138-41.)[4]

Both in Lordstown and in Oshawa, Automodular's contractual relationship with the

Debtors is governed by a series of purchase orders (the "Purchase Orders").  The Ontario Contracts

include a supplemental long term agreement (the "Long Term Agreement").  Both the Purchase

Orders and the Long Term Agreement incorporate by reference the Debtors' General Terms and

Conditions (the "General Terms and Conditions").  (SA 118; SA 140; SA 142-52.)  Not only are the

Purchase Orders explicitly labeled "Requirements Contracts," but both the Purchase Orders and the

---

[3]  In February 2008, DAS LLC resourced the Lordstown business to another supplier.

[4]  Automodular also contracts directly with GM to provide other goods and services not at issue in this dispute,
and thus has contracts directly with, and receives instructions from GM in connection with those contracts.
Although these contracts were requested by the Debtors (SA 291, 313, 315), Automodular's contracts with GM
were not produced and are not part of the record here.

Long Term Agreement include provisions stating that the contract is for "100% of the Buyer's requirements." (SA 77; SA 138.)

Section 3 of the Long Term Agreement provides that "no price increases . . . will be made on account of . . . any increases in Seller's labor, materials, overhead and other costs," and the pricing schedule attached to the Long Term Agreement similarly notes that specified volumes are merely an "Estimated Demand." (SA 141.) Consistent therewith, the General Terms and Conditions specify that price adjustments will not be granted due to changes in volume or delivery schedules. More particularly, Paragraph 2.5 provides that "[i]f the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other compensation." (SA 143, ¶ 2.5 (emphasis added).) Paragraph 2.7 likewise states that the Debtors make no representations or warranties as to the volume of goods or services it will need, and thus guarantee no particular requirement levels under the Contracts. (SA 143, ¶ 2.7.)

Finally, the General Terms and Conditions contain an integration clause stating that the Contracts constitute the entire agreement and supersede all prior oral or written representations and agreements. (SA 152, ¶ 29.) The General Terms and Conditions also expressly state that acceptance of the offer to contract made by the Debtors through the Purchase Orders can be accepted either in writing or by performance. (SA 142, ¶ 1.) Under the terms of the Purchase Orders, as well as the General Terms and Conditions, Automodular accepted the terms of the Contracts when it performed in response to receipt of the Purchase Orders. (SA 142, ¶ 1; SA 79.)

Notwithstanding these express contractual provisions, Automodular asserts throughout its brief that it is entitled to a per-unit price increase from the Debtors based on a

reduction in the number of CRFMs ordered by DAS LLC for installation in GM cars. (Automodular App. Br. 13, 14, 16.)  That is, as the number of units required by DAS LLC fell, Automodular responded by reallocating its fixed labor and overhead costs among the reduced number of units ordered, thus increasing the labor and overhead component that it allocated to each CRFM assembled under the Contracts.  Automodular contends that because the number of CRFMs ordered under the Contracts decreased, it was forced to alter its product delivery schedule, reduce staffing, and increase its assembly line speed, and that each of these actions constitutes a change in the scope of work performed under the Contracts.  (Automodular App. Br. 15-17; SA 157-60.)

DAS LLC does not consider reductions in volume or increases in assembly line production rate to be changes in the scope of goods or services provided under its various contracts. (SA 169; SA 189-90; SA 224-25.)  It is DAS LLC's custom and practice to issue a Design Record Change Notice to its suppliers whenever there is a change to the scope of work provided under its various supplier contracts, most typically in connection with an engineering change such as adding, removing, or changing a material or sub-component.  (SA 169.)  DAS LLC did not issue Design Record Change Notices for any of the CRFM unit reductions or changes that form the basis of Automodular's current requests for price increases.  (Id.)

When a Design Record Change Notice is issued, Paragraph 3 of the General Terms and Conditions explains that upon a change in scope of work, a seller is obligated to provide documentation in support of the asserted increase in production costs.  (SA 143, ¶ 3.)  Although DAS LLC did not agree that the changes cited by Automodular in support of its purported increase in production costs constituted a "change of scope" under the terms of the Contracts, the Debtors requested documentation from Automodular in support of its request, explaining that they would

approach GM to attempt to obtain relief.  (SA 170, ¶ 10; SA 178-79.)  The Debtors never received

from Automodular documentation sufficient to substantiate Automodular's requested price increases.

In July 2006, and again in late 2006, Automodular attempted to renegotiate the

Contracts to obtain terms similar to those requested in the Motion (including variable per-unit

pricing), but the Debtors declined to revise or amend the Contracts.  (SA 243-44; SA 251.)  Mr.

Dell acknowledged during his deposition that Automodular's revised quotation had not been

requested by Delphi, and that the newly proposed pricing terms and conditions were not a part of

the then-existing Contracts.  (SA 309.)  The terms of the Contracts therefore remained unchanged

from the original agreements.

<u>ARGUMENT</u>

I.

The Contracts Are Requirements Contracts That Provide For Fixed Per-Piece Prices
<u>And Do Not Include A Provision For Pricing Variance Based On Changes In Volume</u>

As each of the Contracts states clearly on its face, the Lordstown Contracts and the

Ontario Contracts are requirements contracts, and each provides a fixed per-unit price for every

CRFM for each calendar or model year.  The Contracts do not provide for variable volume-based

pricing, nor do they require the Debtors to purchase from Automodular any particular number of

units, whether measured per hour, day, or year.  They provide instead only that DAS LLC will

purchase "approximately 100% of [its] production and service requirements" from Automodular.

(SA 117; SA 138.)  Each Contract identifies a single per-unit price for each part, without any

provision for alternative prices if the number of units purchased by the Debtors falls below any

particular level.  (<u>Id.</u>)  Although Automodular tried to renegotiate the Contracts to transform them

from fixed price to variable price contracts following a reduction in the number of units ordered by

the Debtors, DAS LLC did not agree to Automodular's unilateral proposal.  (SA 251;  SA 309.)

Automodular's assertion that the parties intended to "share the risk or benefit of volume changes" so that "Automodular would not be unilaterally exposed to the possibility that a material shortfall in volume would result in the under liquidation of the fixed costs incurred", is nothing more than an after-the-fact attempt to reform the terms of the Contracts.  (SA 109-10; see also, e.g., Automodular App. Br. 8, 11-14, 15-17, Docket No. 5.)  The comment also stands in direct opposition to the principles underlying requirements contracts.  As one court has observed in a related context:

> [A]n obligation to buy approximately a stated estimate of goods would pose a significant burden on buyers as it would force them to make inefficient business judgments, when the point of entering a requirements contract was to engage suppliers without binding themselves to buy more goods than they need.  Essentially, a requirements contract represents a risk allocation.  "The seller assumes the risk of a change in the buyer's business that makes continuation . . . costly, but the buyer assumes the risk of a less urgent change in . . . circumstances."

Atlantic Track & Turnout Co. v. Perini Corp., 989 F.2d 541, 544-45 (1st Cir. 1993) (emphasis added) (quoting Empire Gas Corp. v. American Bakeries Co., 840 F.2d 1333, 1340 (7th Cir.1988)).

Under Michigan law, which the parties agree governs this dispute, courts recognize "the validity of 'requirements' contracts." J & B Sausage Co. v. Dep't of Mgmt. & Budget, No. 04-000091-MK, 2007 WL 28409, at *3 (Mich. Ct. App. Jan. 4, 2007) (citing E.C. Dailey Co. v. Clark Can Co., 87 N.W. 761 (Mich. 1901) and Hickey v. O'Brien, 82 N.W. 241 (Mich. 1900)).  Courts have questioned the good faith of a buyer when, in a requirements contract, a buyer substantially increases the volume ordered over the estimated amount, because in situations where "the market price of the subject goods rises above the contract price, a buyer in a requirements contract might be tempted to demand more goods than it truly needs in order to resell them for the better market price." Atlantic Track, 989 F.2d at 544.  However, "exploitation, beyond bad faith, is not a concern if a buyer demands less than a stated estimate." Id.

11

The Bankruptcy Court found here that the reduction in the Debtors' requirements for CRFMs was "due to a decision by the Debtors' buyer, GM, to reduce the number of parts that it needed from Delphi, including by eliminating one vehicle line, not as a result of the Debtors' bad faith." (SA 91.) This is significant, because the law allows for good faith reductions in a buyer's requirements. See, e.g., NCC Sunday Inserts, Inc. v. World Color Press, Inc., 759 F. Supp. 1004, 1008-09 (S.D.N.Y. 1991) ("[T]he seller assumes the risk of all good faith variations in the buyer's requirements . . . .") (citing Empire Gas Corp., 840 F.2d at 1337-38).[5] Although Automodular disingenuously concedes that its "bid to Delphi was for a price with a certain flexibility for volume variations" (Automodular App. Br. 15), Automodular consistently asserts that "an increase and decrease in jobs per hour, one percent, two percent, . . . is . . . a scope change" under the Contracts. (SA 301, 303; see also, e.g., Automodular App. Br. 7-8, 11-14, Docket No. 5.) To allow a price change for any change in volume defeats the purpose of a requirements contract: because an OEM's requirements are constantly changing, the interpretation of the Contracts urged by Automodular would leave the parties essentially with no contract at all, because they would constantly have to renegotiate the pricing terms. Automodular's interpretation of the requirements contracts at issue here thus would obligate a buyer to purchase 100% of its requirements at whatever price the seller demands, an arrangement that makes no business sense.

---

[5]    Cases reaching this conclusion are legion. See, e.g., Wiseco, Inc. v. Johnson Controls, Inc., No. 04-6200, 2005 WL 2931896 (6th Cir. Nov. 4, 2005) (explaining that section 2306(1) of the UCC permits "good faith reductions in requirements, as opposed to increases, even though the reductions may be highly disproportionate to stated estimates"); Brewster of Lynchburg, Inc. v. Dial Corp., 33 F.3d 355, 364-65 (4th Cir. 1994) (a buyer "may reduce its requirements to any amount, including zero, so long as it does so in good faith"); Atlantic Track, 989 F.2d at 544 (section 2306(1) "permits good faith reductions that are highly disproportionate"); Empire Gas Corp. v. Am. Bakeries Co., 840 F.2d 1333, 1338 (7th Cir. 1988) (a buyer can "reduce his requirements to zero if he was acting in good faith, even though the contract contained an estimate of those requirements"); Angelica Uniform Group, Inc. v. Ponderosa Sys., Inc., 636 F.2d 232, 232 (8th Cir. 1980) (per curiam) (section 2306(1) allows buyer "to order reductions which are highly disproportionate to a stated estimate, if such reductions are done in good faith"); R.A. Weaver & Assocs., Inc. v. Asphalt Constr., Inc., 587 F.2d 1315, 1322 (D.C. Cir. 1978) (section 2306(1) "does not preclude good faith reductions that are highly disproportionate to . . . stated estimates").

II.

### The Bankruptcy Court Properly Interpreted The Contract As A Whole, Including Section 3 Of The General Terms And Conditions

Automodular admits that the Contracts constitute requirements contracts, but argues that the changes in volume requirements and line speed are changes in scope under Section 3 of the General Terms and Conditions. (Automodular App. Br. 7-8, 14-16, Docket No. 5; SA 267-68.) The fallacy of Automodular's argument becomes apparent when examining each of the Contracts as an integrated agreement and giving meaning to all of its various provisions.

Contract language that is clear and unambiguous "is reflective of the parties' intent as a matter of law." In re Quality Products, 666 N.W.2d 251, 259 (Mich. 2003); accord UAW-GM Human Res. Center v. KSL Recreation Corp., 579 N.W.2d 411, 414 (Mich. App. 1998) ("This court does not have the right to make a different contract for the parties . . . when the words used by them are clear and unambiguous and have a definitive meaning."). In this regard, Michigan courts recognize that "the intent of the contracting parties is best discerned by the language actually used in the contract." Rory v. Continental Ins. Co., 703 N.W.2d 23, 30 n.21 (Mich. 2005); accord Royal Prop. Group, LLC v. Prime Ins. Syndicate, Inc., 706 N.W.2d 426, 432 (Mich. Ct. App. 2005) (same). The issue of whether or not there is an ambiguity must be examined in "the context of the entire integrated agreement." Vicars v. Environ. Potentials, Inc., No. 06-1272, 2007 WL 2952453 at 3 (E.D. Mich. Oct. 9, 2007). Although Automodular offers a number of competing interpretations of the phrase "scope change" in an effort to create ambiguities in the Contracts (Automodular App. Br. 1, 19-20, Docket No. 5), "the fact that a contract does not define a relevant term does not render the contract ambiguous. Nor is a contractual word or phrase rendered ambiguous merely because the parties ascribe different meanings to it." T&S Distributors, L.L.C. v. Michigan Bell Tel. Co., No. 274767, 2008 WL 724084, at *4 (Mich. App. Mar. 18, 2008). In

13

analyzing whether a contract is clear on its face, therefore, courts must "not strain to find

ambiguity," Cole v. Auto-Owners Ins. Co., 723 N.W.2d 922, 924 (Mich. Ct. App. 2006), and must

avoid "creating ambiguities where none exist."  UAW-GM Human Res. Center, 579 N.W.2d at 414.

   The Bankruptcy Court concluded that Automodular's request for a price adjustment

is precluded by the terms of the Contracts themselves and thus does not comprise a change in scope.

(SA 101.)  As noted above, the Bankruptcy Court found that the Contracts are requirements

contracts which, by their nature, contemplate fluctuating requirements, including declines in the

volume of goods or services required.  (SA 90-91.)  Paragraph 2.7 of the General Terms and

Conditions expressly reflects this principle, and Paragraph 2.5 likewise provides that changes in

delivery schedules, i.e., changes in the rate at which goods or services are ordered, do not trigger

pricing adjustments.  (SA 93-94; SA 143.)  In addition, Paragraph 3 of the Long Term Agreement

specifies that changes in the seller's labor or other costs do not entitle it to price increases.  (SA 138.)

The integration clause at Paragraph 29 and the acceptance at Paragraph 1 of the General Terms and

Conditions further provide that the Contracts are binding on Automodular and supersede all other

representations.  (SA 152.)  Taken as a whole, these provisions demonstrate that Automodular's

argument that it is entitled to a price adjustment based on a change in the Debtors' requirements for

CRFMs is flawed.  As Automodular noted, courts attempt to give meaning to all terms of a contract

(Automodular App. Br. 11, Docket No. 5), but it is Automodular's interpretation of the Contracts

that negates both paragraph 2.5 and 2.7 of the General Terms and Conditions.

   Section 3 of the General Terms and Conditions provides, in relevant part, that

"Buyer may at any time require Seller to implement changes to the specifications or design of the

goods or the scope of any services or work covered by this Contract, including work related to

inspection, testing or quality control."  (SA 143.)  On appeal, as in the Bankruptcy Court,

Automodular contends that the term "change in scope" is ambiguous because it is not specifically defined in the Contracts. (Automodular App. Br. 17-18, Docket No. 5.) To the extent there is an ambiguity in the term "scope change," however —a proposition that the Debtors emphatically reject—that ambiguity arises only when the phrase is examined in isolation from the other terms of the Contracts as Automodular proposes to do here. (Automodular App. Br. 11-15, 17-18, Docket No. 5.) Indeed, as the Bankruptcy Court found, Automodular's interpretation of the phrase "scope change" cannot be reconciled with the Contracts as a whole. (SA 92, 99.)

Section 2.5 of the General Terms and Conditions provides that "[i]f the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other compensation." (SA 143 (emphasis added).) This paragraph unambiguously precludes Automodular from seeking a price adjustment based on GM's, and thus Delphi's, reduced requirements and resulting change in the line rate or production schedule. Automodular's argument that section 2.5 applies only to temporary changes in delivery schedules is not supported by the language of the provision itself. (Automodular App. Br. 11-14, Docket No. 5.) Although the section applies to "temporary suspensions" of shipments, changes to the rate of scheduled shipments are not qualified in any way. (SA 143 (emphasis added).) The Bankruptcy Court's conclusion that "the buyer controls the timing of deliveries and quantities of specified product, without a change in seller's compensation" thus is supported by the text of the General Terms and Conditions and therefore is not clearly erroneous. (SA 93.)

Automodular concedes that the per-unit price changes it seeks "were related to an overall decrease in the volume" of the Debtors' requirements for CRFMs. (Automodular App. Br. 16, Docket No. 5.) The Bankruptcy Court correctly found, however, that the parties had made "no

15

commitment as to any provision of specific forecast of anticipated volume of goods." (SA 94.)

Section 2.7 of the General Terms and Conditions, incorporated by reference in the Purchase Orders and the Long Term Contract, provides:

> Buyer may provide Seller with estimates, forecasts or projections of its future anticipated volume or quantity requirement for goods. Seller acknowledges that any such forecasts are provided for informational purposes only and, like any other forward looking projections, are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time. Buyer makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any such forecasts provided to Seller, including with respect to the accuracy or completeness of such forecasts.

(SA 143; see also SA 78, 140.) Although Automodular asserts that the language of section 2.5 (which concerns rate issues, not volume issues) "does not foreclose the possibility of price adjustments upon changes in scope of service that may result from a change in overall volume" (Automodular App. Br. 13-14, Docket No. 5), Section 2.7 defeats any effort to use the Debtors' volume forecasts and projections as the basis for altering Contract pricing.[6] Indeed, if a change in overall volume were allowed to trigger a price adjustment, section 2.7 would be meaningless, thus running afoul of the principle that contracts must be read as a whole, so as to give effect to each phrase. See, e.g., Vicars, 2007 WL 2952453, at *3; Hunter v. Pearl Assurance Co., Ltd., 291 N.W. 58 (1940). In addition, Automodular's interpretation of the Contracts would permit it to rely on the accuracy or completeness of the volume forecasts, which is exactly what section 2.7 forbids. As the Bankruptcy Court concluded, when the Contracts are read as a whole, particularly in light of "the express language of paragraph 2.7, . . . it [is] absolutely clear that [the] buyer makes no commitment as to any provision of a specific forecast of anticipated volume of goods." (SA 94.)

---

[6]    Automodular similarly argues that the requested price increase is based not on an overall volume change, but instead on changes in the rate of production. (Automodular App. Br. 16, Docket No. 5.) Automodular's characterization of the basis for its proposed price increase not only is inconsistent, but also is barred by separate provisions of the Contracts themselves. The Bankruptcy Court's finding that the facts at hand do not allow for a price adjustment on the Contracts is therefore not clearly erroneous.

Automodular's interpretation of the Contracts would allow a price adjustment for a "change [in] the rate of scheduled shipments" as specifically precluded by section 2.5. (SA 143, <u>see also</u> Automodular App. Br. 15-17, Docket No. 5.) It also would allow Automodular to rely on volume forecasts despite section 2.7's specific statement that the Debtors "make no representation, warranty, guaranty or commitment" as to volumes. (SA 143, § 2.7; Automodular App. Br. 7-8, 13, Docket No. 5.) Automodular's arguments to the contrary notwithstanding (Automodular App. Br. 10-14, Docket No. 5), if a reduction in overall volume (or a change in the rate of production) were considered a "change in scope," Sections 2.5 and 2.7 would have no meaning, and the Contracts would not be requirements contracts. Automodular's efforts to reform the Contracts thus remove all downside risk to Automodular, essentially rendering the Debtors guarantors of the Contracts' profitability for Automodular. When the Contracts are read in their entirety, however, the phrase "change in scope" simply cannot include changes in DAS LLC's requirements, as the Bankruptcy Court correctly concluded. (SA 92-94.)

Under the Ontario Contracts, moreover, Paragraph 3 of the Long Term Agreement provides that no price increases shall be granted on account of increases in seller's labor, materials, overhead, or other costs. (SA 138.) Although Automodular argues for the very first time on appeal that Paragraph 3 relates only to changes that "are not within the control of the buyer" (Automodular App. Br. 15, Docket No. 5), this limitation appears nowhere in the language of the Long Term Agreement. (SA 138-41.) Automodular has admitted, moreover, that it is seeking a price increase in part because its assembly line employees are working more hours than they had been previously . (SA 57.) In its Bankruptcy Court Reply, Automodular also admits that "when the rate of manufacture changes, labor and other fixed costs change because everything has to be rebalanced so that AM can produce at a new rate." (SA 256, ¶ 11.) Automodular's assertion that its demand for a

price increase is not based on labor or overhead costs (Automodular App. Br. 14-15, Docket No. 5) thus is flatly contradicted by the record. Moreover, if Automodular has not incurred and cannot document some increased cost as a result of changes in volume or the number of shifts, it cannot justify a price increase because the contract is not one for a guaranteed yearly profit.

Finally, the structure of the General Terms and Conditions itself undermines Automodular's contention that a volume reduction results in a change in scope. (SA 143.) Changes in volume are addressed in Section 2.7 of the General Terms and Conditions, and rate changes are addressed at Section 2.5. (Id. §§ 2.5, 2.7.) Because delivery rate changes and volume requirements are addressed in provisions separate from Section 3, the General Terms and Conditions' "change of scope" provision, it is clear that the Contracts distinguish between scope changes, on the one hand, and rate or volume changes, on the other. As Automodular itself points out in its brief, the Debtors knew how to create carve-outs and limitations in one section of the General Terms and Conditions by referencing another. (Automodular App. Br. 12, Docket No. 5.) That was not done here. Neither Section 2.5 nor Section 2.7 contains any limitation stating or suggesting that it applies "except as provided in section 3." (SA 143.) In addition, the concerns of Sections 2.5 and 2.7 are more closely focused than those of Section 3. (Id.) As Automodular pointed out in its brief, "in construing contracts, general provisions will yield to specific provisions." (Automodular App. Br. 13, Docket No. 5.)

In sum, the fact that the Contracts do not say what Automodular now wishes they did say does not make them ambiguous. When read as a whole, the Contracts plainly treat changes in volume or production rate separately from changes in the scope of goods or services provided under the Contracts. The Bankruptcy Court's interpretation of Sections 2.5, 2.7, and 3 thus is logical and consistent with the terms of the Contracts read as a whole.

18

III.

Automodular Must Be Bound By The Terms Of the Contracts
It Entered, And Cannot Rely On Extrinsic Terms

When a contract contains an integration clause, the parol evidence rule prohibits a

party from presenting "evidence of contract negotiations" or "prior or contemporaneous

agreements" to "contradict or vary . . . the terms of a contract which is clear and unambiguous."

UAW-GM Human Res. Center, 579 N.W.2d at 414 (explaining parol evidence rule); accord

Wiggins v. Orhanen, No. 264497, 2006 WL 3020259, at *1 (Mich. Ct. App. Oct. 24, 2006) (per

curiam) (same).

That rule applies here.  Although Automodular details the steps it undertook in

negotiating the Lordstown and Ontario Contracts (Automodular App. Br. 3-6, 15-16, Docket No. 5),

Automodular is bound by all of the terms of the Contracts it negotiated with the Debtors, including

the Contracts' General Terms and Conditions, which contain a clear integration clause.  (SA 152;

SA 296.)  Contrary to Automodular's assertion that the Long Term Agreement was not intended to

supersede any prior agreements between the parties (Automodular App. Br. 5-6, Docket No. 5), the

General Terms and Conditions specifically state that each Contract "supersedes all prior oral or

written representations and agreements."  (SA 152.)  Moreover, the General Terms and Conditions

are "incorporated in and a part of each purchase order, release, requisition, work order, shipping

instruction, specification and other document . . . relating to the goods and/or services to be

provided."  (SA 142 (emphasis added).)  Even if Automodular were justified in relying on

documents exchanged during negotiations to alter or amend the Contracts' clear terms—a

proposition that the Contracts' integration clause clearly precludes—the validity and effect of those

documents would be qualified by the General Terms and Conditions.

Automodular representatives read and reviewed the Long Term Agreement and then signed it.  (SA 297.)  Automodular also performed under the Lordstown and the Ontario Purchase Orders starting in 2004.  (SA 156.)  Moreover, both the Purchase Orders and the Long Term Agreement demonstrate that the parties knew how to incorporate other documents by reference when they intended to do so.  (SA 78; SA 140.)  The Bankruptcy Court's enforcement of the integration clause is justified and amply supported by the record in this case.  Consequently, Automodular cannot now rely on prior writings or negotiation-related documents to contradict or vary the terms of its contractual relationship with the Debtors.  See UAW-GM Human Res. Center, 579 N.W.2d at 414.

Automodular's reliance on Wiseco, Inc. v. Johnson Controls, Inc., No. 04-6200, 2005 WL 2931896 (6th Cir. Nov. 4, 2005), for the proposition that Automodular should not be bound by the "unsigned" Purchase Orders is unavailing.  (Automodular App. Br. 14, Docket No. 5.)  As a preliminary matter, Automodular did not raise this argument in the Bankruptcy Court, and thus did not develop a basis, factual or legal, for an appellate court to address this issue, even if this Court were inclined to consider a waived argument.  See, e.g., Vesta Fire Insurance Corp. v. New Cap Reinsurance Corp. Ltd., 238 F.3d 186 (2d Cir. 2001) (finding that arguments not raised before the bankruptcy court were waived); Harvis Trien & Beck, P.C. v. Federal Home Loan Mortgage Corp., 153 F.3d 61, 67 (2d Cir. 1998) (same).  Second, Automodular has insisted throughout this litigation that the Lordstown Purchase Orders and the General Terms and Conditions are the "U.S. Contracts," and that the Oshawa Purchase Orders, along with the Long Term Contract and the General Terms and Conditions, are the "Ontario Contracts," and has brought this action to obtain relief under the Contracts' "change of scope" provision.  (AD Nos. 1, 2; SA 296-97; see also Automodular App. Br. 10-11, Docket No. 5.)  Automodular thus has admitted that it considers the

Purchase Orders binding.  (Id.)  Finally, the purchase orders in Wiseco were not binding because they explicitly required written ratification by both parties, which as a matter of fact did not take place.  See Wiseco, 2005 WL 2931896, at *2.  Here, in contrast, the Purchase Orders and the General Terms and Conditions both provide that "if seller . . . commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification."  (SA 142, SA 78.)  Any suggestion that the Purchase Orders are not binding is contradicted by the record in this case.

IV.

The Unauthenticated, Extrinsic Evidence On Which Automodular Relies Is Hearsay

Even if it were appropriate to consider extrinsic evidence to construe the Contracts' scope change provision, the evidence to which Automodular points—certain deposition testimony of Mr. Blair and the "GM Scope Change Forms" (Automodular App. Br. 19-21, Docket No. 5)— was not admissible to establish the meaning of the term "change in scope" and had no probative value.  (See generally Automodular App. Br. 19-21, Docket No. 5.)

First, the parties to the contracts at issue here are DAS LLC and Automodular, not GM and Automodular.  Automodular attempts to rely, however, on the GM Scope Change Forms, which were issued in relation to Automodular's contracts as a Tier 1 supplier to GM directly.  Not only are these irrelevant third-party documents to which the Debtors are not a party, but Automodular did not even produce copies of its contract with GM.  The GM Scope Change Forms are, therefore, taken entirely out of context.

Moreover, under Michigan law, the integration clause in the General Terms and Conditions precludes Automodular from relying on extrinsic documents to contradict the unambiguous terms set forth in the contracts.  See, e.g., UAW-GM Human Resource Center, 579 N.W.2d at 415-18 ("[W]hen the parties include an integration clause in their written contract, it is

21

conclusive . . . ."); <u>Ind. Lumbermen's Mut. Ins. Co. v. County of Luce</u>, No. 236082, 2002 WL

1277026, at *1 (Mich. Ct. App. June 7, 2002) (per curiam) ("The contract has an explicit integration

clause; therefore, the clause is conclusive that the contract is complete.").

   In addition, it is well settled that out of court statements offered in evidence to prove

the truth of the matter asserted are inadmissible as hearsay, unless a specific exception applies.  Fed.

R. Evid 801(c); <u>see also</u> <u>Barnes v. Prudential Ins. Co.</u>, 76 F.3d 889, 892-93 (8th Cir. 1993)

("Barnes's statements . . . are inadmissible hearsay, as they are only relevant to show . . . the truth of

the matter asserted.").  It should be noted in this regard that Automodular not only refused the

Debtors' discovery request for production of the Automodular-GM contract under which the GM

Scope Change Forms allegedly were issued, but also failed to provide a sponsoring GM witness to

authenticate the Scope Change Forms.  (SA 291, 313, 315; SA 13-17.)  When the Bankruptcy Court

sustained the Debtors' objections to this evidence, Automodular then agreed that the contested

statements in the declarations of Messrs. Blair and Dell should be admitted for non-hearsay

purposes, and afforded the evidentiary weight to which they were entitled.  (SA 12.)  Automodular

likewise agreed that the GM Scope Change Forms would be admitted only for non-hearsay

purposes.  (SA 17.)  Because a trial court is accorded "wide discretion in determining the

admissibility of evidence under the Federal Rules," <u>United States v. Abel</u>, 469 U.S. 45, 54 (1984),

the Bankruptcy Court's decision to limit the usage of this contested evidence is entitled to great

deference.  Based on the record here, the Bankruptcy Court did not abuse its discretion in limiting

the admissibility of this evidence.

   In addition, the record is devoid of support for Automodular's assertion that the

phrase "change in scope" is a term of art in the automobile industry.  (Automodular App. Br. 20-21,

Docket No. 5.)  Automodular's experience with other customers is not only irrelevant here, but any

contracts it may have with customers other than the Debtors are not in the record, and were not submitted by Automodular for the Bankruptcy Court's consideration.  Furthermore, and regardless of how the term "change in scope" may (or may not) be defined in the industry, both of the Debtors' witnesses testified that the Debtors do not recognize reductions in volume or changes in production rates as a basis for price increase under the Contracts because the Contracts are requirements contracts.  (SA 169-70, SA 189-90).[7]  The record in this case thus abundantly supports the Bankruptcy Court's refusal to consider extrinsic evidence offered by Automodular to contradict the Contracts' express provisions.

[Remainder of page intentionally left blank]

---

[7]     The Debtors note that, like the contested provisions of the Blair Declaration, the parties agreed that these sections of the Bauman and Conley declarations would be admitted only for non-hearsay purposes, as, for example, statements that explain subsequent conduct, provide notice, or to show the effect on the person who heard or read the statement.  See generally Barnes, 76 F.3d at 892-93.

<u>CONCLUSION</u>

For all of the reasons set forth above, the Contracts expressly preclude a price adjustment for changes in volume or for changes in the rate of delivery of goods or services. The Bankruptcy Court ruling is legally and factually supported by the record in this case and therefore should be affirmed.


Dated:    New York, New York
          May 27, 2008

                              SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM LLP


                              By:  */s/ Albert L. Hogan, III*
                                   Albert L. Hogan, III (AH 8807)
                                   Francis Neil MacDonald (FM 4308)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois  60606
                              (312) 407-0700

                                        - and -


                              By:  */s/ Kayalyn A. Marafioti*
                                   Kayalyn A. Marafioti (KM 9632)
                              Four Times Square
                              New York, New York  10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                   Debtors and Debtors-in-Possession

24