UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| DELPHI CORPORATION INC., et al., | Case Nos. 05-44481 (RDD) (Jointly Administered) |
| Debtors. |  |
| AUTOMODULAR CORPORATION, et al., | Chapter 11 |
|  | Case No. 08-3752 |
| Appellants, |  |
| v. |  |
| DELPHI CORPORATION INC., et al., |  |
| Appellees. |  |

**REPLY BRIEF OF APPELLANT AUTOMODULAR CORPORATION F/K/A AUTOMODULAR ASSEMBLIES INC., TEC-MAR DISTRIBUTION SERVICES, INC. AND AUTOMODULAR ASSEMBLIES (OHIO) INC. IN FURTHER SUPPORT OF APPEAL TO REVERSE ORDER ENTERED BY BANKRUPTCY COURT**

McCarter & English, LLP

Eduardo J. Glas, Esquire (# EG7027)
245 Park Avenue
27th Floor
New York, New York 10167
(212) 609-6800 - Telephone
(212) 609-6921 - Facsimile
        -- and --
Katharine L. Mayer, Esquire
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19899
(302) 984-6300

Attorneys for Automodular Corporation f/k/a Automodular Assemblies Inc., Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc.

ME1 7423240v.2

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................................... 1

I.  THE BANKRUPTCY COURT ERRED IN ITS INTERPRETATION OF THE CONTRACTS ............................................................................................................................. 1

    1.    Automodular's Claim is Not Based on a Reduction in Volume .............................. 1

    2.    The Bankruptcy Court Erred by Interpreting "Scope Change" as a Change in the Nature of the Product Assembled ...................................................... 3

    3.    Sections 2.5 and 2.7 Do Not Support the Bankruptcy Court's Decision ................................................................................................................................ 4

    4.    Paragraph 3 of the Long Term Agreement is Inapplicable to the Current Dispute ........................................................................................................................ 7

CONCLUSION .................................................................................................................................... 9

ME1 7423240v.2

## TABLE OF AUTHORITIES

### STATE CASES

Davis v. Kramer Brothers Freight Lines, Inc.,
   105 N.W.2d 29 (Mich. 1960) ..................................................................................4

Hesse v. Superior Bus. Forms, Inc.,
   2008 WL 441603 (Mich. App. Feb. 19, 2008)........................................................5

Skarina v. AllState Insurance Co.,
   2005 WL 900552 (Mich. App. April 19, 2005) ......................................................5

**PRELIMINARY STATEMENT**

The ultimate issue in this matter is whether certain changes mandated by Delphi[1] to the assembly process that Automodular was contractually obligated to implement were "scope changes" to the services purchased as that phrase is used in the contracts between the parties. The Bankruptcy Court ruled that the changes were not within the meaning of that phrase because it thought that the phrase "scope change" related to changes in the nature of the product assembled. This interpretation, however, is at odds with the language of the contracts. Tellingly, Delphi does not try to support such meaning of the phrase "scope change." Tellingly too, Delphi offers no explanation from within the four corners of the contracts for the meaning of the words "scope change." Instead, Delphi focuses on the irrelevant and undisputed fact that the contracts were requirement contracts. Worse still, Delphi misconstrues or fails to understand that Automodular's claim is not based on a volume reduction, but in changes to the number of shifts, the number of hours per shift and the speed of the assembly line. Because the contracts at issue are inherently ambiguous, the Bankruptcy Court committed reversible error in holding otherwise. As a result, this matter should be remanded with instructions to the Bankruptcy Court to consider extrinsic evidence to resolve the ambiguities.

**I.
THE BANKRUPTCY COURT ERRED IN
ITS INTERPRETATION OF THE CONTRACTS**

1.   Automodular's Claim is Not Based on a Reduction in Volume

In its moving brief, Automodular showed how the Bankruptcy Court misinterpreted the nature of Automodular's claim by mistakenly believing that the only change that occurred under the contracts was a reduction in volume. Rather than try to refute Automodular's demonstration

---

[1] All capitalized terms not defined herein have the same meaning as set forth in Automodular's moving brief.

1

of error, Delphi has simply ignored the distinctions drawn by Automodular between scope changes and volume changes and has relied on a body of law that has no relevancy to the present dispute.

The agreement between the parties assumed a certain number of shifts, hours per shift, and a certain number of jobs per hour. When these basic assumptions changed before the final agreement between the parties was reached, Delphi requested new bids to reflect the new parameters of the service. See App. Rec. No. 8 at pp. 20-21.[2] Section 3 of the General Terms & Conditions dealing with "scope changes" was designed to serve the same function when the parameters changed after the contract was formed.

Automodular is not trying to convert a requirements contract into a per piece contract. Automodular is simply seeking a price adjustment due to the changes to the services mandated by Delphi. Just like a change in the design of a part may require changes in the assembly process, so too does a change in the rate at which the part is supposed to be assembled. In both instances, Automodular needs to recalibrate its assembly line to satisfy the needs of the ultimate customer. It is a fundamentally different service to assemble in three shifts rather than in two shifts. It is an equally different service to assemble at the rate of ten jobs per hour rather than only five jobs per hour; or to assemble during nine hour shifts instead of eight hour shifts. These changes, Automodular submits, are captured within the meaning of the phrase "changes … to the scope of any services or work covered by this Contract." See General Terms & Conditions, § 3.

It is undisputed that all of the changes in the services provided by Automodular occurred as a result of the changes in GM's assembly line. If the changes implemented would have

---

[2] Automodular has prepared a supplemental appendix of exhibits which will be provided to the Court and counsel, but will not be filed on the docket because of the confidential information contained therein.

2

simply resulted in a reduction in staff as Delphi appears to argue (see Delphi Br. at p. 9), then perhaps the result could have been a savings for Automodular. Unfortunately, the net effect of all the changes in scope actually resulted in an increased cost on a per piece basis to Automodular that Delphi has refused to acknowledge as required by the Contracts.

The issue then is not whether the volume was reduced. The issue is not whether the Contracts were for 100% requirements or how one wishes to call those contracts. Even the Bankruptcy Court recognized that Automodular had no quarrel with how Delphi wished to refer to the Contracts. See App. Rec. No. 37 at p. 5. The issue is that the service was altered by Delphi and the parties had agreed to adjust pricing upon such changes. In failing to grasp that the service was altered within the meaning of the "change of scope" phrase in Section 3 of the General Terms & Conditions, the Bankruptcy Court committed a reversible error.

    2.    <u>The Bankruptcy Court Erred by Interpreting "Scope Change" as a Change in the Nature of the Product Assembled</u>

As argued in Automodular's moving brief, the Bankruptcy Court misinterpreted Section 3 of the General Terms & Conditions by reading limiting words into the Section where none existed. The Bankruptcy Court interpreted "changes… to the scope of any services or work covered by this Contract" as requiring a change in the nature of the product being assembled. Automodular showed that this interpretation was at odds with other portions of Section 3 that specifically addressed changes to the nature of the goods and rendered superfluous the phrase "changes… in scope of any services or work…" Tellingly, Delphi does not address, and therefore, concedes, that the Bankruptcy Court misinterpreted Section 3 in this regard.

Tellingly too, Delphi offers no explanation that can be gleaned from the four corners of the document for the meaning of the phrase "changes… in scope of any services or work…" Relying on extrinsic evidence, the self-serving declaration of its representative Greg Conley,

3

Delphi claims that it does not consider reductions in volume or increases in assembly line production rate to be changes in the scope of goods or services provided under its various contracts.[3] Delphi Br. at p. 9. Of course, Delphi's subjective understanding is not controlling. See Davis v. Kramer Bros. Freight Lines, Inc., 105 N.W.2d 29, 31-32 (Mich. 1960) ("A one-sided self-serving interpretation by one party is of no help in interpretation [of a contract]."). Moreover, Mr. Conley's declaration is inadmissible hearsay, as shown by his own testimony during his deposition: "… what was determined to be a change in scope by Delphi is not my job expertise." App. Rec. No. 8 at p. 48. "It was not in my authority to determine what was a change in scope." Id. at 49. He also had no direct knowledge of the statement made in his declaration, but simply relied on what he was supposedly told by someone at the purchasing department. See Id. at 52-53. Delphi's only other witness, Mr. Bauman, also testified that he was not familiar with the phrase "scope change." See App. Rec. No. 9 at p. 33. After reading Section 3 of the General Terms & Conditions, however, Mr. Bauman acknowledged that the phrase "scope change" could be more than just a change in design. See Id. at 35-36.

In short, because the meaning of "scope change" could not be determined from within the four corners of the Contracts, the Bankruptcy Court committed a reversible error in finding the documents unambiguous and in holding that the phrase meant a change in the nature of the product assembled.

   3.  <u>Sections 2.5 and 2.7 Do Not Support the Bankruptcy Court's Decision</u>

Offering no explanation to the meaning of the phrase "scope change" within the four corners of the contracts, Delphi relies, following the Bankruptcy Court's reasoning, on Sections 2.5 and 2.7 of the General Terms & Conditions to support its overarching interpretation of the

---

[3] Ironically, Delphi complains that Automodular relies on what Delphi terms hearsay evidence, but Delphi has no compunction in using inadmissible hearsay when it suits its purposes.

4

Contracts. As demonstrated in Automodular's moving brief, reliance on these two sections is misplaced.

First, Section 2.5 does not bar Automodular's claim. Section 2.5 deals with the speed of deliveries or with temporary suspensions. It does not address overall changes to services. Equally important, contrary to Delphi's argument (See Delphi Br. at 14) this section does <u>not</u> deal with changes in the rate at which goods or services are ordered. Shipping and ordering are two distinct concepts. The word "order" is not used in Section 2.5. A change in the shipping rate does not necessarily imply a change in ordering. As Automodular explained, Section 2.5 deals with disruptions that result from strikes, temporary suspensions or slow down in deliveries due to problems in the ultimate assembly line. That is why the section refers to shipments rather than orders. It was not meant to affect the changes in the scope of services covered by Section 3.

Delphi also argues that there are no carve outs in Section 2.5 to exclude the scope changes of Section 3. The argument has no merit because it fails to acknowledge the specific provision in Section 3 that deals with delivery schedule adjustments for scope changes. Clearly, a scope change in the services contracted such as the number of shifts, the number of hours to be worked per shift and the speed of assembly was not meant to be trumped by the language in Section 2.5. On the contrary, the parties foresaw that such changes would affect delivery schedules and that is why Section 3 distinguishes them from the schedule adjustments of Section 2.5. Section 3 is then the more specific provision that overrides Section 2.5. <u>See</u> <u>Skarina v. AllState Ins. Co.</u>, 2005 WL 900552 at *4 (Mich. App. April 19, 2005) ("In construing contracts, general provisions will yield to specific provisions.") (citations omitted). At best, the interplay between Section 2.5 and Section 3 creates an ambiguity that the Bankruptcy Court could not resolve as a matter of law and without admitting parol evidence. <u>See</u>, <u>e.g.</u>, <u>Hesse v. Superior</u>

5

Bus. Forms, Inc., 2008 WL 441603 at *3 (Mich. App. Feb. 19, 2008) (even in the context of a fully integrated agreement, extrinsic evidence is admissible to construe the meaning of ambiguous terms or provisions).

Section 2.7 is not a bar to Automodular's claim either. As set forth in the moving brief, the language in Section 2.7 does not foreclose the possibility of price adjustments upon changes in scope of services such as an increase in the speed of the assembly line and the number of hours per shift. These changes do not necessarily require a change in volume. For instance, the line can assemble the same number of units in less shifts by working at a greater speed. It bears repeating that, as much as Delphi tries to muddle the issue, a reduction in volume is not the basis of Automodular's claim. Section 2.7 is irrelevant to the changes in the line speed, number of shifts and number of hours per shift which must be analyzed under Section 3.

With respect to the Lordstown Contract, Automodular argued in its moving brief that, to the extent terms in the General Terms & Conditions contradict or conflict with the terms of Automodular's offer, those terms cannot be binding on Automodular. Delphi's claim that Automodular never raised this argument below is belied by the record. Mr. Blair clearly stated this position at his deposition: "I do believe that we proceeded on the basis of a belief that the general terms and conditions published by Delphi would have applicability to the extent they were not inconsistent with the other understandings that we reached." App. Rec. No. 10 at p. 20. This position, moreover, is consistent with Automodular's claim throughout this dispute. The purchase orders and the General Terms & Conditions are part of the contract between the parties, but to the extent they are inconsistent, they do not override the other documents (RFQs, Automodular's written bid, etc.) that also formed part of the parties' agreement. Equally important, Delphi offers no law to support its proposition that the General Terms & Conditions,

which were never countersigned by Automodular, are binding wholesale on Automodular. Thus, at the very least, with respect to the Lordstown Contract, the matter should be remanded to determine what the agreement was between the parties in connection with changes in the speed of the line, number of shifts and hours per shift.

    4.    <u>Paragraph 3 of the Long Term Agreement is Inapplicable to the Current Dispute</u>

With respect to Paragraph 3 of the Long Term Agreement, it is obvious from a plain reading of the paragraph that it only applies to changes in costs that are not within the control of the buyer. Clearly, cost increases that result from changes directed by the buyer are not controlled by this paragraph. Automodular has repeatedly stated throughout this dispute that its costs are fixed once its assembly process is installed to satisfy a customer's orders. <u>See</u>, <u>e.g.</u>, App. Rec. No. 10 at p. 22. Even Delphi's own witness admitted that a reduction in shifts does not equate with an increase in labor, overhead or material costs. <u>See</u> App. Rec. No. 8 at p. 55. The increase in costs that Automodular suffered as a result of the changes in scope reflect a changed per unit calculus and not an increase in labor, overhead or material costs. It is almost tautological that Paragraph 3 of the Long Term Agreement has no applicability here.

Finally, Automodular disputes many of the assertions in Delphi's brief regarding the purported economic rationale for requirements contracts.[4] There is absolutely no support on the record for such bald assertions as the purported need to constantly reprice the contracts in the event Automodular were to prevail. <u>See</u> Delphi Br. at p. 12. As Automodular explained, scope changes are not implemented lightly. <u>See</u> App. Rec. No. 10 at pp. 92-94 ("It is not just something they can do willy-nilly."). They are very expensive and usually a last resort alternative. <u>See</u> <u>Id</u>. Similarly, Automodular disputes the characterization of the evidence

---

[4] There is a certain irony in having a debtor in bankruptcy expound on which contracts or business models make economic sense and which ones do not.

7

presented to the Bankruptcy Court as hearsay or the belated attack on the authenticity of the GM "Scope Change Forms." Delphi never raised any authentication objection to those forms. See Delphi's Supplemental Appendix ("SA") at pp. 14-15 (Delphi's own counsel stated in open court: "And I think its [sic] undisputed that the scope change forms were issued by General Motors…"). None of these issues, however, are relevant to the present appeal. It will be up to the Bankruptcy Court on remand to resolve them. What is relevant for purposes of this appeal is that the Bankruptcy Court committed errors in finding the contracts unambiguous and refusing to consider the extrinsic evidence presented to resolve the ambiguity.

ME1 7423240v.2

## **CONCLUSION**

      For the reasons stated in this brief and in Automodular's moving brief, this matter should be remanded to the Bankruptcy Court to resolve the ambiguities in the Contracts with the extrinsic evidence that was presented but ignored by the Bankruptcy Court.

      /s/ Eduardo J. Glas
      Eduardo J. Glas, Esquire (# EG7027)
      MCCARTER & ENGLISH, LLP
      245 Park Avenue
      27th Floor
      New York, New York 10167
      (212) 609-6800 - Telephone
      (212) 609-6921 - Facsimile

      and

      Katharine L. Mayer, Esquire
      MCCARTER & ENGLISH, LLP
      Renaissance Centre
      405 N. King Street, 8th Floor
      Wilmington, DE 19899
      (302) 984-6300 - Telephone
      (302) 984-6399 - Facsimile

      Attorneys for Automodular Corporation f/k/a Automodular Assemblies Inc., Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc.

DATED: June 6, 2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION INC., et al., | : | Case Nos. 05-44481 (RDD) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | Chapter 11 |
| AUTOMODULAR CORPORATION, et al., | : | |
| | : | Case No. 08-3752 |
| Appellants, | : | |
| v. | : | |
| DELPHI CORPORATION INC., et al., | : | |
| Appellees. | : | |

## CERTIFICATE OF SERVICE

     I, Eduardo J. Glas, do hereby certify that on June 6, 2008, a true and correct copy of the **Reply Brief of Appellant Automodular Corporation F/K/A Automodular Assemblies, Inc., Tec-Mar Distribution Services, Inc. and Automodular Assemblies (Ohio), Inc. in Further Support of Appeal to Reverse Order Entered by Bankruptcy Court** was served via overnight delivery to the following:

John W. Butler, Jr., Esq.
Sarah J. Platt, Esq.
Skadden, Arps, Slate, Meagher & Flom
333 West Wacker Drive, Suite 2100
Chicago, IL  60606

                                          MCCARTER & ENGLISH, LLP

                                          /s/ Eduardo J. Glas
                                          Eduardo J. Glas, Esquire (# EG7027)
                                          245 Park Avenue
                                          27th Floor
                                          New York, New York  10167
                                          (212) 609-6800 - Telephone
                                          (212) 609-6921 - Facsimile

ME1 7435282v.1